UNITED STATES of America, Plaintiff–Appellee,

v.

Jerry Winslow CLARK, Defendant–Appellant.

No. 89–5547.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 6, 1989.

Decided Dec. 12, 1989.

James Orlando Broccoletti (Zoby & Broccoletti, Norfolk, Va., on brief), for defendant-appellant.

Robert Bullington Wilson, V, Sp. Asst. U.S. Atty. (Henry E. Hudson, U.S. Atty., Alexandria, Va., Robert E. Bradenham, II, Asst. U.S. Atty., Norfolk, Va., on brief), for plaintiff-appellee.

Before RUSSELL and PHILLIPS, Circuit Judges, and HAYNSWORTH,\* Senior Circuit Judge.

PER CURIAM:

Jerry Clark was convicted of one count of possession of cocaine with intent to distribute and one count of possession of heroin with intent to distribute, both in violation of 21 U.S.C. § 841(a)(1). On appeal, Clark challenges the denial of a pretrial motion to suppress evidence allegedly gained in violation of his fourth amendment rights. Finding no error in the district court's ruling on the suppression motion, we affirm the convictions.

I

On October 17, 1988, Clark arrived in Norfolk International Airport from New York's LaGuardia Airport. Two Virginia police officers, who were also deputized agents of the Drug Enforcement Agency, Charles Mills (14 years police experience) and Thomas Downing (10 years), were at the Norfolk airport conducting surveillance for drug couriers who might be arriving on the flight from LaGuardia. Detectives Mills and Downing saw Clark deplane at approximately 8:00 P.M. and observed several features of his appearance and conduct that fit the profile of a drug courier: Clark

---

\* Judge Haynsworth participated in the consideration of this case but died prior to the time the decision was filed. The decision is filed by a quorum of the panel. 28 U.S.C. § 46(d).

was the third person to deplane, walked rapidly up the jetway overtaking the two passengers who had deplaned ahead of him, was wearing a bulky jacket, and was carrying a shoulder bag that appeared to be empty.

Detectives Mills and Downing trailed Clark as he walked rapidly through the long airport corridors and then more slowly when he reached the lobby area. Although he had just flown into Norfolk, Clark headed toward the escalator marked "Departure"—not toward the "Arrival" area where the baggage claim was located—and then out of the terminal. Just outside the terminal, Detective Mills caught up with Clark and asked if he could talk to him. Clark said, "Sure." Mills asked Clark if he had just flown into Norfolk, and Clark said he had not. Mills then identified himself and Downing, who was standing some distance away, as DEA agents and again asked Clark whether he had just arrived on a flight; Clark again denied that he had. Upon request for identification, Clark handed the agents a Virginia driver's license, issued in the name of Jerry Winslow Clark. At this point, Clark's hands were shaking noticeably, and he had bitten his lip so sharply that it appeared to be bleeding.

Detectives Mills and Downing next asked Clark if they could search him and his shoulder bag. Clark consented and even raised his arms aloft, a gesture he was told was unnecessary. The search of the bag uncovered some jewelry and a receipt indicating that the jewelry had been purchased in New York that day. More significantly, the bag contained a first-class one-way airline ticket, paid for in cash, for the flight from which Clark had just deplaned. The ticket, which had been issued in the name of Brian Smith, had attached to it a baggage claim stub. Clark denied any knowledge of the ticket and of the claim stub, insisting that he had come to the airport to see his girlfriend off on a flight to Newark and that she had handed him the shoulder bag just before she left.

The agents next asked Clark if he would walk with them to the baggage claim. Clark agreed to do so, and followed the agents to the carousel. As they were waiting for the suitcase, Detective Mills noticed that Clark kept glancing towards the exit doors, causing Mills to suspect that Clark might try to flee. Eventually, the agents removed the suitcase that matched the stub from the carousel. Questioned then about the suitcase, Clark twice denied any knowledge of it.

At this point, 8:25 P.M., Mills told Clark that he was not free to leave and that he and the suitcase would be detained until a drug-sniffing dog could come to check the suitcase. The agents called around to the Newport News and Virginia state police, but had difficulty locating a dog. Meanwhile Clark waited in the DEA airport office, a large room with some desks, but no holding cell. At 9:43 P.M., the agents contacted George Ball of the Virginia Beach police, who brought over a Virginia State Police certified drug-sniffing dog. Out of Ball's sight, the agents put the suspicious suitcase in a room with about five other items of luggage. Ball and the dog went into the room, and at approximately 10:15 P.M., the dog alerted to the suitcase. Detective Downing obtained a search warrant. Because Clark again denied ownership of the locked suitcase, and therefore would not produce any key, Mills and Downing had to force the suitcase open with a knife. Inside were two bricks of cocaine and 300 packets of heroin. A later search uncovered 200 more packets of cocaine hidden in a shoe.

On November 22, 1988, a pretrial hearing was held on Clark's motion to suppress the evidence seized from the suitcase. The essence of Clark's claim was that the evidence was the fruit of unconstitutional "seizure" of his person. Clark argued first that during the initial questioning outside the terminal he was "seized," within the meaning of the fourth amendment, and that the agents lacked the reasonable suspicion that would have justified this investigative stop. He argued further that after the removal of the suitcase from the baggage carousel he was detained for such a prolonged period that he was de facto arrested, and that probable cause for that arrest was lacking. The district court de-

nied the motion to suppress. Clark now appeals the resulting criminal convictions, challenging the ruling on the suppression motion.

## II

■ Clark first contends that the DEA agents' initial questioning of him outside the airport terminal was an unreasonable "seizure" within the meaning of the fourth amendment which tainted all that ensued leading to eventual discovery of the evidence. The applicable fourth amendment principles are well established. If, during an encounter with law enforcement officials, a reasonable person would not believe that he was free to leave under the circumstances, a fourth amendment "seizure" has occurred. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). At a minimum, such a stop must be founded on a "reasonable and articulable suspicion that the person seized is engaged in criminal activity." *United States v. Gooding,* 695 F.2d 78, 82 (4th Cir.1982) (quoting *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam)); *see also Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). If, on the other hand, a reasonable person would have believed that he was free to leave given the circumstances of the encounter, the law enforcement officials need not justify their actions with any articulable suspicion; such an encounter is thought to be consensual, no different in kind from normal, everyday meetings between citizens, and consequently outside of the scope of the fourth amendment. *See Mendenhall,* 446 U.S. at 553–54, 100 S.Ct. at 1876–77; *Terry,* 392 U.S. at 34, 88 S.Ct. at 1886 (White, J., concurring).

■ The district court's finding that Clark had not been "seized" during the initial encounter with Agents Mills and Downing must stand unless it is clearly erroneous. *See United States v. Aguiar,* 825 F.2d 39, 40 (4th Cir.1987). At the suppression hearing, Detective Mills testified that he first approached Clark in an open area just outside the terminal, while Detective Downing stood some distance away. Mills asked Clark if he could speak to him, and Clark responded, "Sure." Mills then identified himself and Downing as DEA agents, in an effort, so Mills testified, to allay any fear that Clark might have had about being harmed or tricked by unidentified strangers. Mills proceeded to ask Clark several questions and, with Clark's consent, to search his shoulder bag.

■ Although Clark gave a different version of this occurrence, the district court credited Detective Mills' testimony and ruled that Clark had not been seized at this point. In light of Mills' testimony, the court's finding on this issue is not clearly erroneous, and therefore we need not consider whether the agents had a reasonable suspicion of criminal activity to justify this initial questioning of Clark. Because this conduct did not constitute an unconstitutional seizure of Clark, no taint upon eventual discovery of the evidence resulted from it.[1]

## III

Clark's second argument is that once he was indisputably "seized"—after the suitcase was retrieved and he was told that he was not free to leave—he was thereafter detained for so long that what may have begun as an investigative *Terry* stop ripened into a de facto arrest.[2] That arrest, he maintains, was without probable cause and led to the discovery of the evidence of the drugs.

■ The fourth amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects

---

1. This makes unnecessary any inquiry into whether eventual discovery of the evidence—via discovery in turn of the baggage check, then the suitcase, then the contents—was sufficiently causally connected to the initial encounter to poison the ultimate fruit. *Cf.* Part III A, *infra.*

2. Clark has not argued that the circumstances as they appeared to the police at the baggage carousel would not support a finding of reasonable suspicion to justify this investigative stop, i.e., the "seizure," at its inception.

from unreasonable searches and seizures." U.S.Const. Amend. IV. When law enforcement officials have violated this right by unreasonably intruding on one or more of these protected spheres of privacy, the evidence gained as a result of that intrusion may, in appropriate cases, be ruled inadmissible at a subsequent criminal trial. In analyzing a motion to suppress evidence gained in violation of the fourth amendment, a court must first identify the character of the alleged violation and the evidence that was obtained as a result of that violation. Even when a fourth amendment violation has concededly occurred, evidence challenged on a suppression motion will not be excluded unless a causal relationship exists between that particular violation and the discovery of the evidence sought to be excluded. *See Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (quoting Macguire, *Evidence of Guilt* 221 (1959)) (where causal connection may have been broken through attenuation, a court must consider "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."); *see also Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) (evidence admissible if obtained from "independent source"); *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (evidence admissible if it would have been inevitably discovered).

Clark contends that the evidence of the contents of the suitcase should have been suppressed as the fruit of an illegal arrest. To address this contention, we must first identify the precise "seizure" that is alleged both to have violated the fourth

amendment and caused the discovery of the evidence sought to be suppressed—the drugs in the suitcase. Clark appears to focus on two distinct seizures: that of his person and that of the suitcase. Given the circumstances of this case, particularly the fact that Clark on at least three occasions denied ownership of the suitcase, we must analyze separately the alleged fourth amendment violations to see why neither warrants suppression of the contents of the suitcase.[3]

### A

■ We turn first to the alleged illegal arrest of Clark himself. Even if we were to agree with Clark that the 110–minute detention exceeded the permissible length of a *Terry* stop, becoming at some point an arrest without probable cause, we would not agree that the evidence of the drugs should have been suppressed. There is no causal link between the detention of Clark's person and the opening, of the *suitcase* that led to that discovery. The detention of Clark himself, on the other hand, did not lead to the uncovering of any evidence. That detention obviously made more convenient his ultimate arrest on probable cause once the suitcase was pried open. But even if it constituted a fourth amendment violation of Clark's right not to be unreasonably detained in custody—a question we need not decide—the lack of any discernible causal relationship between that detention and the independent discovery of the drugs in the suitcase disentitles Clark to suppression of the evidence.

### B

■ The second "seizure" at issue is the detention of the suitcase for 110 minutes.

---

**3.** In some otherwise factually similar airport drug courier cases, the law enforcement officials have seized only the person's luggage and have not formally detained the person. *See United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1982); *United States v. Alpert*, 816 F.2d 958 (4th Cir.1987). Nonetheless, the Supreme Court recognized in *Place* that a seizure of luggage at an airport is functionally equivalent to a seizure of the person possessing that luggage. While the Court noted that the person is technically still free to leave,

"such a seizure [of luggage] can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return." *Place*, 462 U.S. at 708, 103 S.Ct. at 2645.

This case differs from cases like *Place* and *Alpert* in at least two important (and related) respects: the suspect, Clark, repeatedly and vigorously denied ownership of the suitcase, and the officials, therefore, seized Clark himself and the suspicious suitcase independently.

Patently, that seizure did lead to the discovery of the evidence, and if the seizure violated Clark's fourth amendment rights, the evidence should not have been admitted at his criminal trial. We hold, however, that Clark's denial of ownership, or even knowledge of, the suitcase precludes him from arguing now that he had a reasonable expectation of privacy in the suitcase that would give rise to fourth amendment protection.[4]

In *United States v. Washington*, 677 F.2d 394 (4th Cir.1982), this court considered a similar fourth amendment claim of a defendant who denied ownership of luggage that was searched. The defendant who denied ownership of luggage that was searched. The defendant who raised the claim in *Washington*, Patricia Williams, had picked up a suitcase from an airport baggage claim and was standing at a curb check-in area, apparently waiting for a ride. There, Williams was approached by drug enforcement agents and was asked two times if the bag was hers. Both times she denied that it was. The agents then asked if they could search the bag. She said, "It's not my bag. I don't care what you do," and stepped to the side. The agents searched the bag and found a large quantity of heroin.

On these facts, we held that Williams had "disclaimed any interest, hence any expectation of privacy, in the contents of the suitcase," *id.* at 396, and we therefore upheld the district court's denial of her motion to suppress, on fourth amendment grounds, the evidence of the heroin. We declined to require law enforcement officials to make arcane inquiries into the possibility that Williams may have had an expectation of privacy in the suitcase. Instead, we held that "the agents could justifiably rely on her statements to think they

would not violate her rights by opening the bag." *Id.* This approach, we think, was perfectly consistent with the first element of the Supreme Court's view of what constitutes a "reasonable expectation of privacy" entitled to protection under the fourth amendment: "first ... a person [must] have *exhibited an actual (subjective) expectation of privacy* and, second, that ... expectation [must] be one that society is prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring) (emphasis added).

In this case Clark three times denied that he knew anything about the suitcase, even though it matched the claim stub found in his shoulder bag. Indeed, at the point when the search warrant had been obtained and was about to be executed, he would not produce a key to open the suitcase, insisting still that it was not his and that he knew nothing about it. Under these circumstances, we find that Clark did not "exhibit an actual (subjective) expectation of privacy," *id.*, such that he may now complain of a fourth amendment violation.[5]

### IV

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

---

**4.** We do not mean to imply that Clark lacked standing to bring this fourth amendment challenge, inasmuch as he later admitted that the suitcase was his. *See* 4 W. LaFave, Search and Seizure § 11.3(a), at 287 (2d ed. 1987) ("[A] mere disclaimer of a property interest made to the police prior to the search ... under the better view does not defeat standing.").

**5.** The possibility that Detectives Mills and Downing may have believed that the suitcase belonged to Clark, and that this belief may in turn have caused them to refrain from opening the suitcase immediately, does not alter our conclusion that Clark's "disclaimer of interest," *see Washington*, 677 F.2d at 396, in the suitcase is fatal to his attempt to show that he had a reasonable expectation of privacy in its contents.