**UNITED STATES of America**

v.

**Howard TATE.**

**No. C–CR–90–60.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

Aug. 22, 1990.

Rodney S. Toth, Charlotte, N.C., for plaintiff.

H. Thomas Church, Charlotte, N.C., for defendant.

## ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on a Memorandum and Recommendation (hereinafter "M & R") filed by United States Magistrate Paul B. Taylor on July 31, 1990.

The M & R was filed in response to Defendant's motion, filed June 6, 1990, to suppress approximately 104 grams of cocaine base seized from Defendant's person at the Charlotte airport. The Government filed a response to the motion on June 15, 1990. The Magistrate conducted hearings on July 3 and July 6, 1990 to consider arguments and to receive evidence. On August 14, 1990, Defendant timely filed objections to the M & R's recommendation that the Court deny the motion to suppress.

Title 28, United States Code, Section 636(b) permits the Court to designate a magistrate to conduct hearings and to submit to the Court proposed findings of fact and recommendations for the disposition by the Court of any motion to suppress or dismiss a bill of indictment. The magistrate is required to file his proposed findings and recommendations with the Court. Within ten (10) days after being served with a copy, any party may file written objections to the proposed findings. The Court must then make a de novo determination of those portions of the proposed findings or recommendations to which objection is made. The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The Court may also receive further evidence or recommit the matter to the magistrate with instructions.

In conducting its de novo review, the Court has carefully considered the entire record in this matter. In particular, the Court has reviewed Defendant's motion, the Government's response to the motion, the M & R, and Defendant's objections to the M & R. Additionally, the Court has considered the applicable law. The Court has also listened to the audio tape from the probable cause and detention hearing conducted by Magistrate Taylor on April 23, 1990.[1] Finally, the Court has read the

---

1. The reason the Court listened to the audio tape from the probable cause hearing was that Defendant stated in his objections that Officer Davis testified at the probable cause hearing that the bulge he observed was located on the *outside* of Defendant's left ankle. At the suppression hearing, Officer Davis testified that he observed the bulge on the *inside* of Defendant's left ankle. Thus, Defendant has requested that the Court order a transcript of the probable cause hearing be produced at the Government's expense, and that the Court consider Officer Davis' supposed contradictory testimony for purposes of impeachment.

Because of the great expense and inconvenience to the Government incurred by producing transcripts, the Court is reluctant to enter such an order unless entirely necessary. In this case, the Court listened to the hearing to determine whether production of a transcript was necessary. In response to a question from Defendant's counsel regarding the location on Defendant's ankle of the bulge, Officer Davis responded, "On the *inside, the inside* of his ankle".

It is obvious that Officer Davis testified consistently at both hearings regarding the location of the bulge. Accordingly, the Court will not order the transcript produced.

transcripts from the hearings conducted by the Magistrate.

■ After considering Defendant's objections in light of the entire record, the Court concludes that the Magistrate's findings of fact are accurate and that the legal conclusions are sound. The Court believes that the officers' collective testimony was consistent regarding the observation of a bulge on Defendant's left ankle. Accordingly, Officer Jones had the requisite probable cause to arrest Defendant based on the drug courier profile characteristics [2] and the observation of the bulge. *See United States v. Aguiar*, 825 F.2d 39, 41 (4th Cir.), *cert. denied*, 484 U.S. 987, 108 S.Ct. 505, 98 L.Ed.2d 503 (1987). The failure of Officer Jones to place Defendant under arrest prior to the intervention by Officer Davis does not eviscerate or nullify the probable cause.[3]

■ The Court fully agrees with the Magistrate that the actions of Officer Davis in seizing Defendant's jacket were inappropriate and would have resulted in suppression of evidence had any been found in the jacket. But as the Magistrate concluded, "[T]here is no causal link between the seizure of the jacket and his discovery of the bulge". *See* M & R at 17; *see also Transcript from July 3, 1990 Hearing* at 96 (Defendant admitted that Officer Davis returned jacket before observing the bulge). Therefore, the seizure of the jacket, even if improper, cannot support a motion to suppress drugs found on Defendant's ankle. M & R at 17 (citing *United States v. Clark*, 891 F.2d 501, 505 (4th Cir.1989). Accordingly, the Court affirms the Magistrate's conclusion of law that Officer Davis had probable cause to arrest Defendant after observing the bulge.[4]

---

The Court urges Defendant's counsel in the future to only make accurate representations to the Court. Although the Court did not order a transcript in this case, the Court might have needlessly ordered a transcript based on defense counsel's representations.

2. The Court would be remiss if it failed to note an incorrect statement made by the Magistrate during the hearing of this matter. At the hearing on July 6, 1990, the Magistrate stated:

Let me just stop you right there and I'll tell Mr. Church. I don't ever want to hear another Agent come in here and tell me that the placement of a suspect at the front or the middle or the back of a plane is a drug courier profile statistic because I'm going to find it's not ... I agree. That's not a drug courier profile characteristic. *Transcript from Hearing of July 6, 1990* at 4–5.

Apparently, the Magistrate believes that the testimony from agents in the past that drug couriers have exited the plane in various locations has eviscerated the order of deplaning as a legitimate drug courier profile.

The Court does not believe that there is any legal support for such a conclusion. The Fourth Circuit has listed the order of deplaning as a legitimate drug courier profile characteristic. *See United States v. Clark*, 891 F.2d 501, 502–03 (4th Cir.1989) (Defendant was third person to deplane). Therefore, the Court believes that the order of deplaning is a legitimate drug courier profile characteristic that must be considered with other characteristics.

3. The Court believes that the failure of Officer Jones to place Defendant under arrest after observing the bulge was a result of inexperience. The Court believes that it is reasonable to as-

sume that Officer Davis would have directed Officer Jones to place Defendant under arrest as soon as learning about the bulge. Officer Davis would have probably learned of this information while debriefing Officer Jones. *See Transcript from July 3, 1990 Hearing* at 66 ("[I]f Officer Jones had told me he saw the bulge, then I would have gone out the door and tried to find him again and examine the bulge").

The Court agrees with the Magistrate that because the Officers were acting in close concert, their collective knowledge may be considered in determining whether there was probable cause for an arrest, even if the information was uncommunicated. *See United States v. Bernard*, 623 F.2d 551, 561 (9th Cir.1979). A technical application of the exclusionary rule in this case would accomplish only one thing—the Defendant would go free. The Fourth Amendment's reasonable clause does not mandate such a result. *See United States v. Ragsdale*, 470 F.2d 24 (5th Cir.1972).

While it might have been preferable for Officer Davis to allow Defendant to leave the airport and learn of the bulge from Officer Jones, the Court does not believe that the Fourth Amendment requires police officers—forced to make quick decisions in an arrest situation—always follow the preferable course of action. The Court believes that it was reasonable for Officer Davis to intervene when he did. The collective, uncommunicated knowledge regarding the bulge can be imputed to Officer Davis.

4. Defendant has requested that the Court conduct an evidentiary hearing concerning whether the bulge was visible. The Court assumes Defendant is requesting that the drugs be placed

NOW, THEREFORE, IT IS ORDERED that the M & R be AFFIRMED AND ADOPTED IN ITS ENTIRETY, and that the motion to suppress be DENIED.

IT IS FURTHER ORDERED that Defendant's motions that a transcript from the probable cause hearing be produced, and that the Court conduct an evidentiary hearing be, and hereby are, DENIED.

The Clerk is directed to certify copies of this Order to Defendant, defense counsel, United States Magistrate Paul B. Taylor, and the United States Attorney.

## MEMORANDUM & RECOMMENDATION

PAUL B. TAYLOR, United States Magistrate.

THIS MATTER is before the undersigned Magistrate on reference from the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) to consider a motion to suppress filed by Defendant Howard Brown. On July 3 and July 6, 1990, the undersigned conducted hearings to receive evidence and arguments on this motion. Having fully considered the testimony and arguments presented at the hearings, as well as the pertinent legal authorities, the undersigned herewith enters the following findings of fact, conclusions of law, and recommendation.

## I. FINDINGS OF FACT

Officer K.L. Jones of the Mecklenburg County Police Department testified that he and several other officers, including Charlotte Police Officer Jerry Sennett and North Carolina State Bureau of Investigation Special Agents Jack Davis and M. K. Kiger, were engaged in narcotics interdiction surveillance at the Charlotte airport on April 11, 1990. At approximately 5:20 p.m., these officers were stationed in the terminal concourse area observing passengers deplane from U.S. Air flight number 254, a non-stop flight from New York City. Officer Jones testified that New York City has been identified as a known source city for drugs. The officers were dressed in casual clothes and their weapons were concealed. Standing approximately 30 feet from Gate C-15, Officer Jones observed the Defendant, Howard Brown, deplane toward the beginning of the line of passengers. The Defendant was wearing blue jeans that were baggy from his knee to his ankle, with several creases, long athletic socks and blue long johns that extended to his ankle underneath his jeans, a sweatshirt, and a bulky leather jacket. Officer Jones also observed that the Defendant was wearing a large gold ring and was carrying a black athletic bag.

Officer Jones observed the Defendant turn to the left, stop approximately ten feet away, set the bag down on the floor, and then make extended eye contact with him. The Defendant then picked the bag up and began walking down the concourse. As he was walking, he looked back over his shoulder at Officer Jones and Agent Kiger at least three times. As the Defendant was passing through the security check point, Officer Jones pointed out to Agent Kiger that he observed a bulge on the Defendant's left ankle. Officer Jones testified that in his experience, drug couriers will conceal drug packages on their ankles.

Officer Jones and Agent Kiger followed the Defendant to the lower level baggage claim area where they approached him in the open public area. On that level there were three airport exits within thirty feet of where they approached the Defendant. Officer Jones and Agent Kiger approached the Defendant from the side with their credentials in their hands, and Agent Kiger stated, "Excuse me, could we talk with you a moment?" to which the Defendant responded "Yes." Agent Kiger then identified himself and Jones as police officers to

on Defendant's ankle in open court and that the Court determine for itself whether the bulge is observable.

The Court believes that there is an abundance of credible testimony in this record that the bulge was observable on the day in question.

The conditions at the airport cannot be replicated in the Courtroom. Additionally, the exact manner in which Defendant was wearing his pants on that day cannot be duplicated. Therefore, the Court believes it would be improper for it to conduct an evidentiary hearing.

the Defendant, and asked if he could look at the Defendant's airline ticket. The Defendant produced part of his ticket and Agent Kiger asked to see the rest of it, where-upon the Defendant produced the rest of his ticket. As he looked at the airline ticket, Agent Kiger told the Defendant that he was not under arrest or in custody and that the officers were just seeking his cooperation. Agent Kiger then asked the Defendant if his name was Cole, to which the Defendant responded, "Yes, D. Cole." When Agent Kiger asked the Defendant about the nature of his travel, the Defendant responded that he was coming from New York to visit his family in Kinston. Officer Jones observed that the Defendant appeared to be nervous and that his hands were shaking. Agent Kiger asked the Defendant when his flight to Kinston was to leave, to which the Defendant replied 5:30. Agent Kiger asked the Defendant if he had any other identification, and the Defendant stated that he did not. By this time, Agent Kiger returned the airline ticket to the Defendant. Agent Kiger then asked if the Defendant had any other bags, to which the Defendant responded, "No, just this one. Do you want to search it?" Agent Kiger then stated, "You don't mind, do you?" to which the Defendant responded, "No." Agent Kiger then told the Defendant that he was a narcotics officer looking for contraband coming through the airport, and asked the Defendant for consent to search both his person and his bags. Agent Kiger informed the Defendant that a search would not cause him to lose his flight. The Defendant responded, "I don't know why you want to search me." Agent Kiger then stated to the Defendant that he was not under arrest or in custody and that they were just looking for his cooperation. The Defendant then repeated that he did not want to be searched, but informed the agents that they could search his bag. At this point, Officer Jones searched the bag and found no contraband.

Agent Kiger then informed the Defendant that the officers could conduct a search of his person in a more private place. In response to this request, the

Defendant stated that he wanted to talk to a lawyer and started to walk away. At this time, Officer Jones saw a bulge in the Defendant's shirt and asked the Defendant what it was. The Defendant lifted his shirt to show that it was a large medallion and kept walking. Officer Jones had no further contact with the Defendant until after his arrest, but observed Agent Davis and Agent Kiger speaking to the Defendant and conducting an arrest. After the arrest, Officer Jones participated in removing a clear plastic bag with white powdery substance, that appeared in Jones experience to be crack cocaine, from the Defendant's left ankle.

On redirect, Officer Jones added that the Defendant's airline ticket indicated that it was purchased the same day and paid for in cash, and further indicated that no identification was presented when the ticket was purchased.

Special Agent Jack A. Davis, a special agent with the North Carolina State Bureau of Investigation for twelve years, testified that on April 11, 1990, he was engaged in narcotics interdiction surveillance at the Charlotte airport. Agent Davis testified that he has been conducting drug interdiction investigations at the Charlotte airport for eleven years and has stopped hundreds of passengers suspected of carrying drugs.

On April 11, 1990, Agent Davis was on duty with Officer Jones, Officer Sennett, and Agent Kiger. All of these officers were dressed in casual clothes, and their weapons were concealed. The officers and agents were stationed near Gate C–15, observing passengers deplane from flight # 254 from New York City, which has been identified by law enforcement agencies as a known source city for drugs.

Agent Davis described the "drug courier profile" as being a set of articulable characteristics which vary from case to case, but when viewed in the totality of the circumstances, indicates the possibility of drug activity.

When the Defendant came off the jet way, Agent Davis observed that he ap-

peared to be carrying a brand new bag. This was significant because on past occasions, Agent Davis has found that drug couriers frequently buy a new bag either to carry the drugs in or to create the false impression that they are carrying luggage. The Defendant started up the concourse and looked back at Agent Kiger and Officer Jones. In his experience in airport drug interdiction, Agent Davis has observed that drug couriers frequently look around in an effort to see if police are watching them. Agent Davis further described the Defendant as being dressed in casual clothes, with a wide gold ring on his finger.

While Officer Jones and Agent Kiger followed the Defendant, Agent Davis remained at Gate C–15 to observe the rest of the deplaning passengers. Agent Davis then went to the baggage claim area, where, from approximately 30 feet away, he observed Officer Jones and Agent Kiger approach the Defendant. After observing the officers talking to the Defendant for a while, Agent Davis observed Officer Jones open the Defendant's bag and search it. At some point thereafter, Agent Davis heard the Defendant say something about calling a lawyer and saw him walk away from the other officers. At this time, Agent Davis approached the Defendant, showed his credentials and asked if he could talk to him. However, the Defendant kept walking toward the telephone. Agent Davis followed the Defendant who stated that he wanted to call a lawyer. Agent Davis informed the Defendant that he could call a lawyer, that he was not under arrest or in custody, and that the officers were seeking his cooperation and just wanted to talk to him. At this point, the Defendant stopped approximately five feet from a row of telephones. Agent Kiger had been walking a few steps behind the Defendant and informed Agent Davis that the Defendant's name was Cole, but that he had no identification and that there was a different name on the baggage tag. Agent Davis then informed the Defendant that he wanted to detain his jacket for a drug dog sniff. The Defendant removed his jacket and handed it to Agent Davis.

Agent Davis then asked the Defendant where the jacket should be sent, and, after some hesitation, the Defendant read the address from the luggage tag. The Defendant then asked Agent Davis if he could have his airline ticket back and Agent Davis handed the jacket back to the Defendant so that he could remove the ticket. At this time, Agent Davis observed a bulge on the Defendant's left ankle and asked, "How far up do those shoes go?" The Defendant responded by pulling up his left pants leg. At this time Agent Davis could further see the bulge on the Defendant's leg. Agent Davis testified that in previous cases, he has found narcotics concealed in the ankle area of couriers in 25 to 50 cases. In only one case was an ankle bulge not drugs, but in that case, it was a packet of money. When Agent Davis saw the bulge, he bent over and reached for the Defendant's leg and patted the bulge. Upon touching the bulge, it appeared to be a soft baggie containing some material inside it. After feeling this bulge, Agent Davis placed the Defendant under arrest and directed Officer Jones and Sennett to search him.

Agent Davis testified that the drug courier profile characteristics that he was aware of prior to reaching for the bulge on the Defendant's leg were the following: (1) that the Defendant had arrived from a known source city for drugs; (2) that the Defendant deplaned toward the front of the line of passengers; (3) that the Defendant was wearing casual clothes and a large gold ring; (4) that the Defendant appeared to be carrying a brand new bag; (5) that the Defendant made extended eye contact with the other officers; (6) that the Defendant looked back over his shoulder several times as he walked down the concourse; (7) that the Defendant wanted to call a lawyer after being questioned; (8) that the Defendant appeared to be nervous; (9) that when he asked the Defendant where he should send the jacket after the drug dog sniff, the Defendant had hesitated and was not sure of the address to which it should be sent; and (10) that

Agent Davis observed a bulge in the ankle area of the Defendant's left pants leg.

Officer Jerry Sennett testified that he is a narcotics vice officer with he Charlotte Police Department and was engaged in drug interdiction surveillance at the Charlotte airport on April 11, 1990. After the Defendant was arrested, Officer Sennett took part in the search of the Defendant's person. Upon searching the Defendant's pants leg, he found inside the left sock a plastic bag with white powdery substance that appeared to be crack cocaine. The packet was a little larger than a baseball and more circular than rectangular, and to the best of Officer Sennett's memory, was removed from the inside of the Defendant's left ankle, tucked inside the sweat pants that were under his jeans. Upon analysis by the Charlotte Police crime laboratory, this white substance was found to be 96.3 grams of cocaine base.

Howard Brown, the Defendant, testified that he arrived in Charlotte on April 11, 1990, and that it was his first time in the Charlotte airport. He stated he had to look around the airport several times because he was trying to find signs telling him where to go to catch his next flight. The Defendant testified that while standing in the airport, two men approached him and asked to speak with him. They identified themselves as officers, asked him his name, and asked if they could search his person and his bag. The Defendant responded "No." The officers then asked to see his ticket. The Defendant gave them his ticket and told them his name was D. Cole. The Officers approached the Defendant at twenty-some minutes after five, and his next flight was scheduled to leave the Charlotte airport at 5:30. When he told the officers this, they told him not to worry, that he would not miss his flight.

The officers told the Defendant he was not under arrest and that they were looking for contraband, including explosives, weapons and drugs. The officers again asked to search the Defendant, to which he again said, "No." The officers then asked to search just the bag, to which the Defendant consented. The Defendant asked the officers, "Why are you doing this to me?" The officers told the Defendant to calm down and again asked to search him, to which he again said "No." The officers stated that they could conduct the search somewhere more private to which the Defendant responded "No, that's alright." After the officers finished searching his bag, the Defendant picket it up and walked on to catch his flight. The Defendant testified that he did not say anything about calling a lawyer to either of the first two officers. The Defendant walked no more than five feet when another officer approached him and said that he was going to delay the Defendant and asked what was on his chest. The Defendant lifted his shirt and displayed a chain and necklace. The officer then tried to persuade the Defendant to see things his way. At this point, the Defendant said he thought he should call a lawyer and walked toward some nearby telephones. The officer followed him and stated "Let's not play games," and informed him that he had a right to detain his jacket. At this point, the Defendant gave the officer his jacket, and the officer searched and returned it. The officer then asked the Defendant how high up the sneakers went. The defendant pulled up his right pants leg, but the officer reached for his left leg.

The Defendant conceded that he did have a package of drugs concealed inside the sock of his left ankle, but that the bulge was not visible on his pants. The Defendant stated that he felt that he was not free to walk away when the officers were questioning him.

At the time of his arrest, the Defendant was on parole for the offense of assault with a deadly weapon. He has also previously been convicted of possession of a firearm.

Upon examining the demeanor of the witnesses who testified with regard to this motion, the undersigned finds that the testimony offered by Officer Jones, Agent Davis, and Officer Sennett was, despite minor discrepancies, credible, and more likely than not represents the true version of events. With regard to the Defendant,

the undersigned likewise finds that his testimony was credible, but only to the extent that it was not in express conflict with the testimony offered by the agents.

## II. CONCLUSIONS OF LAW

In his present motion to suppress, the Defendant claims that the officers' initial approach to him constituted a seizure and that such seizure occurred without sufficient evidence to establish a reasonable suspicion that he was engaged in criminal activity; that he did not fit the "drug courier profile"; that the officers lacked probable cause to search, stop, seize, or arrest him; and that any statements he made after his arrest were the product of the prior illegal seizure and search.

The Fourth Amendment to the Constitution of the United States provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." "This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio*, 392 U.S. 1, 8–9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968). The ultimate question in this case is whether, in light of all the surrounding circumstances, the Defendant's "right to personal security was violated by an unreasonable search and seizure." *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968).

In *Terry v. Ohio*, the Supreme Court held that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." 392 U.S. at 16, 88 S.Ct. at 1877. This standard was further developed in *United States v. Mendenhall*, where the Supreme Court held that "a person is 'seized' only when, by means of physical force or show of authority, his freedom of movement is restrained." 446 U.S. 544, 553, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980) (Plurality opinion of Stewart). In discussing this standard, Justice Stewart further observed that

As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

.　　.　　.　　.　　.

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. In *Mendenhall*, police officers approached the defendant in the public concourse of the Detroit Metropolitan airport after she had left an aircraft which had arrived from Los Angeles. The officers asked to speak with Mendenhall and asked for identification and a copy of her ticket. In that situation, the plurality held, no seizure had occurred. In particular, the plurality noted that "the events took place in the public concourse," and that "[t]he agents wore no uniforms and displayed no weapons." 446 U.S. at 555, 100 S.Ct. at 1878. The plurality then held that "nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way, and for that reason, we conclude that the agents' approach to her was not a seizure." 446 U.S. at 555, 100 S.Ct. at 1878. The "not free to leave" standard was subsequently adopted by a majority of the Court in *I.N.S. v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984).

Two years after the *Mendenhall* decision, a plurality of the Supreme Court held in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) that where police officers fail to return a suspect's airline ticket and driver's license and ask him to accompany them to a private room off the airport concourse, that person has been seized within the meaning of the Fourth Amendment. However, in his analysis of the law regarding initial ap-

proaches by police officers to individuals in public places, Justice White observed for the plurality that

> [l]aw enforcement officers *do not violate* the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering into evidence in a criminal prosecution his voluntary answers to such questions.

.    .    .    .    .

Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. *Florida v. Royer*, 460 U.S. at 497–98, 103 S.Ct. at 1322–24.

Because the four dissenting justices likewise found the initial approach of Royer to be lawful, this part of the plurality opinion apparently enjoys the support of at least eight justices. *See* dissenting opinions of Justices Blackmun and Rehnquist, 460 U.S. at 513–519 and 523 n. 3, 103 S.Ct. at 1332–1336 and 1338 n. 3. Justice Brennan wrote a separate concurring opinion to emphasize that he disagreed with both plurality camps and that he believed the defendant was seized once the officers approached him and asked to see his ticket and identification. *See* concurring opinion of Justice Brennan, 460 U.S. at 509, 103 S.Ct. at 1330.

The United States Court of Appeals for the Fourth Circuit has likewise upheld approaches of the type that occurred in this case. In *United States v. Lehmann*, 798 F.2d 692 (4th Cir.1986), police officers had followed a suspected drug courier into the airport parking lot where they "politely asked Lehmann if he would answer a few questions." Upon obtaining Lehmann's agreement, the officers asked for and received permission to look at his airline ticket and driver's license. The officers also asked for and obtained consent to search Lehmann's bags. Although the officers had also detected a suspicious bulge in Lehmann's clothing, that fact was not relevant to the Court's finding that the initial

approach was not a seizure. On the above facts, the court observed that

> The record amply supports the conclusion that from Lehmann's perspective and that of the officers, Lehmann was free to refuse the initial request for questioning and the search of his travel bag. Under *Florida v. Royer*, 460 U.S. 491 [103 S.Ct. 1319, 75 L.Ed.2d 229] (1980), and *United States v. Mendenhall*, 446 U.S. 544 [100 S.Ct. 1870, 64 L.Ed.2d 497] (1983), Lehmann's voluntary cooperation with such requests does not, absent coercive circumstances not present here, implicate the Fourth Amendment. 798 F.2d at 694.

*Accord, United States v. Alpert*, 816 F.2d 958, 959–60 (4th Cir.1987), where, after finding that officers had approached a suspect at the entrance to an airport bar and asked to speak with him, the Court held that "clearly, the encounter was a consensual one from the officers' first approach."

■ Using the standards set forth in the cases cited above, the undersigned finds that Officer Jones' and Agent Kiger's initial approach and questioning of the Defendant did not constitute a seizure. Officer Jones and Agent Kiger wore casual clothes, displayed no weapons, and approached the Defendant in a public area. Moreover, everything about their approach to the Defendant indicates that their manner was polite, non-threatening, and precatory. Agent Kiger asked the Defendant if he could speak to him. When the Defendant responded, "Yes," Agent Kiger then engaged him in polite conversation. Nothing in Agent Kiger's manner or words required the Defendant to agree to speak to him, and he very easily could have declined his request by simply saying, "No," or "I don't wish to be bothered."

■ Furthermore, upon speaking with the Defendant and examining his ticket, the officers learned that the Defendant claimed to have no identification, that his airline ticket was purchased on the same day as travel and paid for in cash, and that the Defendant's name was Cole, although the officers believed that a different name was on his baggage tag. These facts, to-

gether with the facts that the Defendant had arrived from a known source city for drugs, his extended and repeated eye contact with the officers, and Officer Jones' observance of a bulge on the Defendant's ankle—an area known by Officer Jones to be a place where drug couriers attempt to conceal drugs—established probable cause for the officers to detain the Defendant and seize the bulge from his ankle. *United States v. Aguiar*, 825 F.2d 39, 41 (4th Cir.), *cert. denied*, 484 U.S. 987, 108 S.Ct. 505, 98 L.Ed.2d 503 (1987) ("Whether or not the policeman's observance of the bulge at the ankle alone was enough to constitute probable cause for arrest, we need not decide, but in combination with the drug courier profile characteristics exhibited by Aguiar, it would constitute probable cause for arrest.").

Despite the existence of probable cause, Officer Jones and Agent Kiger, perhaps partly because of their relative newness to the assignment of airport drug courier surveillance, and partly because of the Defendant's abrupt manner in walking away from them, did not immediately arrest the Defendant. However, the failure to arrest the Defendant at this time did not divest the officers of probable cause, nor does it vitiate the subsequent arrest, which occurred only a few minutes later, within a few feet of where the officers had questioned the Defendant, and after the Defendant had remained in the officers' sight.

The undersigned is somewhat troubled, however, by Agent Davis' approach to the Defendant and statement that he had the right to detain his jacket for a drug dog sniff. Although Agent Davis stated at the hearing that he was relying on the Supreme Court's holding in *Place v. United States*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), that case authorized the brief detention of luggage where police officers have a reasonable suspicion that contraband is contained therein. Key to the Court's holding in *Place* was the limited intrusion on a person's privacy that is occasioned by subjecting sealed luggage to a drug dog sniff. ("We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.") 462 U.S. at 707, 103 S.Ct. at 2644. The undersigned has found no case which has extended the holding in *Place* to authorize police officers to require persons on the street to remove articles of clothing from their bodies. To the contrary, because requiring a suspect to remove his clothing permits the officer to search by feel the removed article, and by sight that portion of the suspect's body that was concealed by the removed clothing, such a demand is tantamount to a seizure of the person, and must be supported by probable cause, or at least a reasonable suspicion that the suspect is armed and dangerous.

However, because Agent Davis found no contraband in the jacket, and in fact returned it before observing the bulge on the Defendant's ankle, there is no causal link between the seizure of the jacket and his discovery of the bulge. Without such a causal relationship, the seizure of the jacket, even if improper, cannot support a motion to suppress the drugs found on the Defendant's ankle. *United States v. Clark*, 891 F.2d 501, 505 (4th Cir.1989).

At the time he observed the bulge on the Defendant's ankle, Agent Davis was also aware of several drug courier profile characteristics exhibited by the Defendant. He had arrived on a flight from New York City, a known source city for illegal narcotics; he had made extended eye contact with the officers when he got off the plane and looked over his shoulder at them at least three times while walking down the concourse; he appeared to be carrying a new bag; he was casually dressed and had a large gold ring on his finger; and, as related by Agent Kiger, he was traveling without identification, and the name he gave appeared to be different from that on the baggage tag. These factors, taken together with Agent Davis' experience in airport drug courier surveillance, and his knowledge that drug couriers frequently conceal drugs on their ankles, provided sufficient probable cause to arrest the Defendant. *United States v. Aguiar*, 825 F.2d 39, 41

(4th Cir.), *cert. denied*, 484 U.S. 987, 108 S.Ct. 505, 98 L.Ed.2d 503 (1987).

Further, even if Agent Davis lacked probable cause himself, Agent Kiger and Officer Jones, standing just a few feet away had already developed probable cause for an arrest. Where law enforcement agents are acting in close concert with one another, their collective knowledge may be considered in determining whether there was probable cause for an arrest, even if they have not communicated to one another the extent of their knowledge. *United States v. Bernard*, 623 F.2d 551, 561 (9th Cir.1979). *Accord, Smith v. United States*, 358 F.2d 833, 835 (D.C.Cir.1966), *cert. denied*, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967) ("The correct test is whether a warrant if sought could have been obtained by law enforcement agency application which disclosed its corporate information, not whether any one particular officer could have obtained it on what information he individually possessed.").

Accordingly, considering the totality of the circumstances in this case, the undersigned finds that the officers' approach to the Defendant in a public waiting area of the Charlotte airport did not constitute a seizure within the meaning of the Fourth Amendment and that, although the Defendant was free to refuse their request to speak with him, he nonetheless voluntarily chose to respond to their questions, and thereby gave them additional information upon which they could develop probable cause for his arrest as a drug courier. Accordingly, the Defendant's motion to suppress is without merit and should be denied.

### III. RECOMMENDATION

Wherefore, on the basis of the foregoing, the undersigned Magistrate respectfully recommends that the Defendant's motion to suppress evidence and statements be *denied*.

### IV. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(C), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to *de novo* review by the district court, *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982), and will preclude the parties from raising such objections on appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

The Clerk is directed to certify copies of this Order to defense counsel and the United States Attorney.

This 31st day of July, 1990.