**UNITED STATES of America**

v.

**Merrick Bill THOMAS, Jr., Milton Rodriguez Valencia, and Victoriano A. Minotta.**

**No. 6:91 CR 52.**

United States District Court,
E.D. Texas,
Tyler Division.

Feb. 24, 1992.

As Amended March 12, 1992.

Stuart Platt, Asst. U.S. Atty., Tyler, Tex., for plaintiff.

David Cunningham, Houston, Tex., F.R. "Buck" Files, Jr., Tyler, Tex., for defendants.

## AMENDED MEMORANDUM OPINION

JUSTICE, District Judge.

Early on the morning of August 4, 1991, a Sunday, defendants Merrick Bill Thomas, Jr., Milton Rodriguez Valencia, and Victoriano A. Minotta were stopped on a highway near Carthage, Texas, by an officer of the Texas Department of Public Safety for alleged safety-belt law violations. At the present time, they are awaiting trial on federal felony cocaine trafficking charges that could result in their incarceration for life. Defendants challenge the law enforcement actions by which the evidence against them was obtained as being violative of the Fourth Amendment and Texas law. They have moved for the suppression of all incriminating evidence. A nine-hour hearing was held on December 30–31, 1991, and a total of nine briefs were filed relating to the factual and legal issues surrounding the events of August 4, 1991. While the process through which the cocaine secreted in defendants' automobiles was discovered cannot be described as flawless, all evidence seized from the defendants is admissible against them at their trial, with one exception.

### I. The Stop of the Vehicles

#### A. Factual Background

Texas Department of Public Safety Trooper Barry Washington routinely patrols the highways in Panola County, Texas, particularly U.S. 59 and the loop bypass of the city of Carthage. On Sunday morning, August 4, 1991, Thomas Knight, a civilian, rode along with the officer. At about 8:30 a.m., Washington turned his patrol car onto U.S. 59 south, and pointed out to his passenger that a vehicle proceeding northbound, and about to turn on to southeast loop 59, was being driven by a man, later identified as defendant Thomas, who appeared not to wear his safety belt, as required by Tex.Rev.Civ.Stat.Ann. art. 6701d, § 107C (West 1992). Defendant Thomas, an African–American, was driving a late model, brown automobile.

Because of construction work on the highway, the trooper was required to drive south on U.S. 59 for a considerable distance before he could turn his vehicle around to pursue the apparent safety-belt law violator. Washington thereupon exited U.S. 59 north onto the loop, and activated his emergency lights. Washington's and Knight's accounts of what they observed next differ in noteworthy respects. According to Knight, they perceived two almost identical brown vehicles travelling side by side, with Thomas' vehicle in the right hand lane. Knight remembers that the second vehicle, occupied by defendants Valencia (the driver) and Minotta (a passenger), then veered to the right, clearing the passing lane. Knight testified that Valencia then slowed his vehicle to allow the officer to get in between the two cars. Knight recalls that Washington motioned the second vehicle to turn off the highway onto the shoulder, as he passed it.

For his part, Washington recollects that he first saw the vehicles one behind the other in the passing lane, proceeding at a slow rate of speed, with Thomas' vehicle in the lead. As he approached in the left lane, Washington claims that the second vehicle refused to yield, blocking his path. The officer states that after Thomas' auto moved into the right-hand lane, he passed the second car on the right, where he could observe that the passenger, Minotta, was not wearing his seat belt.[1] Washington recalls that his seeing a brown 1987 Mercury Cougar with Tennessee plates followed by a 1988 brown Mercury Cougar LSI with a Tennessee paper tag aroused suspicions of illicit activity.

Having pulled in behind Thomas' car, Washington instructed Knight to watch the second vehicle in the patrol car's rear-view mirror. Washington and Knight concur that, immediately thereafter, they each saw Minotta throw a small package out his window, near a guard rail. Washington remembers motioning the second vehicle to stop at that time. The three vehicles came to a stop onto the side of the road, and the trooper positioned his patrol car between the two brown Cougars on the roadway shoulder.

### B. The Validity of the Vehicle Stops

#### 1. The Articulated Grounds

■ The intentional stopping of an automobile by a police officer is a seizure within the meaning of the Fourth and Fourteenth Amendments. *Brower v. County of Inyo*, 489 U.S. 593, 596–97, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989); *Delaware v. Prouse*, 440 U.S. 648, 653, 661, 99 S.Ct. 1391, 1396, 1400, 59 L.Ed.2d 660 (1979). As drivers of their respective vehicles, defendants Thomas and Valencia have standing to contest the legality of the stopping of their vehicles. *United States v. Kye Soo Lee*, 898 F.2d 1034, 1037–38 (5th Cir.1990); *United States v. Martinez*, 808 F.2d 1050, 1056 (5th Cir.), *cert. denied*, 481 U.S. 1032, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987). Al-though he was merely a passenger, Minotta has standing to challenge the *stop* of the car in which he was riding. *United States v. Erwin*, 875 F.2d 268, 269 n. 2 (10th Cir.1989); *United Sate v. Portwood*, 857 F.2d 1221, 1222 (8th Cir.1988), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2073, 104 L.Ed.2d 638 (1989); *United States v. Williams*, 589 F.2d 210, 214 (5th Cir.1979), *modified on other grounds*, 617 F.2d 1063 (5th Cir. 1980).

■ A stop based upon the violation of a traffic law for which custodial arrest is not permitted is analogous to the stops authorized by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Berkermer v. McCarty*, 468 U.S. 420, 436–440, 104 S.Ct. 3138, 3148–50, 82 L.Ed.2d 317 (1984). Such a stop need be supported only by an officer's reasonable articulable suspicion that the suspect is engaged in illegal activity. *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). A traffic stop supported by probable cause may exceed the bounds of a *Terry* stop. *McCarty*, 468 U.S. 439 n. 29, 104 S.Ct. 3150 n. 29. Washington indisputably possessed probable cause to stop Thomas' vehicle for a safety belt violation. Even though Thomas testified he was wearing his safety-belt, he admitted the shoulder strap was behind him, so that it may have appeared to the officer that his safety belt was unfastened. The mere appearance of such a traffic violation was sufficient to justify the stop of Thomas' auto.

■ However, the factual situation surrounding the seizure of second vehicle is disputed. Washington testified he stopped the second car only after Minotta threw the package out of the window, at a time after the trooper had noticed the seat belt violation. Either Minotta's throwing the package or a seat-belt infraction unquestionably would have furnished reasonable suspicion to stop the car and investigate. However,

---

**1.** At the hearing on the motion to suppress, Washington testified that both Valencia and Minotta were not wearing their seat-belts. However, all the officer reports filed in connection with the August 4, 1991, stop mention a safety-belt violation by Minotta only. The court will proceed on the basis of the contemporaneously written reports.

Knight, the trooper's civilian passenger, recalls that Washington motioned for the second automobile to stop as they passed it, and before the drugs were thrown. Knight testified that he did not observe any traffic violations respecting the second car or its occupants.

There is no need to choose between the contrasting factual scenarios proposed by Washington's and Knight's testimony. Last term, the United States Supreme Court ruled that a seizure for the purposes of the Fourth Amendment does not occur until a person yields to a show of authority by a law enforcement officer. *California v. Hodari D.*, — U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In that case, the state admitted that the officer had no grounds to chase the suspect for the purpose of stopping him. However, during the chase, Hodari D. threw away a package of drugs, which did, of course, provide reasonable suspicion for a stop. The Court ruled that because no seizure had occurred until Hodari D. yielded, i.e., was tackled by the officer, the drugs were not the fruit of any illegal seizure. 111 S.Ct. at 1552.

█ Applying the *Hodari* principle to the traffic stop, even if officer Washington had directed the second vehicle to stop without reasonable, articulable suspicion, a Fourth Amendment seizure would not have occurred until the vehicle pulled off the road. *Hodari D.*, 111 S.Ct. at 1561 (Stevens, J., dissenting). By the time the seizure of the vehicle occurred, the package had been thrown by passenger Minotta, and, therefore, the stop of the second car was legitimately supported by reasonable, articulable suspicion.

### 2. Were the Stops Pretextual?

Defendants argue that the stops of their vehicles were pretextual and, thereby, illegal, regardless of whether they wore their safety belts. Defendants are under the impression that because the applicable federal jurisprudence focuses on objective reasonableness, it offers no basis upon which to suppress a pretextual stop. Instead they urge that their seizures should be evaluated under Texas law, which, they

insist, considers the subjective motivation of the officers making the stop. However, the status of pretext stops under both federal and Texas law is significantly more complicated than acknowledged by defendants. Moreover, the questions of whether and in what way Texas law can be utilized by a federal court ruling on a motion to suppress evidence are not susceptible to easy answer.

#### a. Federal Law

██ It is beyond dispute that under federal law, questions arising under the Fourth Amendment are to be answered with respect to objective reasonableness without regard to the officer's subjective motivation. *See, e.g., Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985); *Scott v. United States*, 436 U.S. 128, 137, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action as long as the circumstances, viewed objectively, justify that action." *Scott*, 436 U.S. at 138, 98 S.Ct. at 1723.

The Supreme Court has never squarely addressed the issue of pretextual searches. *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 2314, 110 L.Ed.2d 112 (1990) (Brennan, J., dissenting). However, several United States Courts of Appeals have done so, and as Justice White recently noted, they have approached the issue in conflicting fashions. *See Cummins v. United States*, — U.S. ——, 112 S.Ct. 428, 429, 116 L.Ed.2d 448 (1991) (White, J., dissenting from the denial of writs of certiorari), *denying cert.* to 920 F.2d 498 (8th Cir. 1991), *and denying cert. to United States v. Trigg*, 925 F.2d 1064 (7th Cir.1991), *and denying cert. to Enriquez–Nevarez v. United States*, 931 F.2d 890 (5th Cir.1991) (summary affirmance).

The United States Court of Appeals for the Sixth, Ninth, Tenth, and Eleventh Circuits evaluate charges of pretext by examining what a reasonable officer *would have done* under the circumstances. *Compare United States v. Miller*, 821 F.2d 546, 549

(11th Cir.1987) (illegal traffic stop pretextual for drug search where infraction is one for which reasonable officer under the circumstances would not have made the stop) *with United States v. Hardy,* 855 F.2d 753, 756–57 (11th Cir.1988) (stop lawful as it would have been made absent improper motivation), *cert. denied,* 489 U.S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989). *See also United States v. Deases,* 918 F.2d 118, 121 (10th Cir.1990) (test is whether a reasonable patrol officer routinely would have effected the stop), *cert. denied,* —— U.S. ——, 111 S.Ct. 2859, 115 L.Ed.2d 1026 (1991); *United States v. Lillard,* 929 F.2d 500, 502 (9th Cir.1991) (citing *United States v. Prim,* 698 F.2d 972, 975 (9th Cir.1983) (question is whether violation was objective cause for the stop)); *United States v. Crotinger,* 928 F.2d 203, 206 (6th Cir.1991) (objective inquiry as to whether officer would have made stop absent invalid purpose).

However, the United States Court of Appeals for the Fifth Circuit, as well as the Seventh and Eighth Circuits, looks to whether the officer *could* have made the stop on account of "a legitimate reason."[2] *United States v. Gallo,* 927 F.2d 815, 818 (5th Cir.1991) (citing *United States v. Causey,* 834 F.2d 1179, 1184 (5th Cir.1987) (en banc) ("so long as the police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry")). *Accord United States v. Trigg,* 925 F.2d 1064, 1065 (7th Cir.) (recognizing approach eliminates the concept of pretextual seizure), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 429, 116 L.Ed.2d 448 (1991); *United States v. Cummins,* 920 F.2d 498 (8th Cir.1990) (although pretext stops are unreasonable under the Fourth Amendment, only question is whether officer had a legitimate reason for stop), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 429, 116 L.Ed.2d 448 (1991).[3]

Thus, defendants' claims of pretext do not meet the legal standard in the Fifth Circuit, not because federal courts analyze stops under objective reasonableness, but rather because in this circuit all that is required is "a legitimate reason" for a stop, regardless of what a reasonable officer would have done under the circumstances. As noted above, Washington was objectively authorized and legally permitted to stop each of the vehicles in this case. Therefore, under the law of this circuit the car stops were not pretextual.

### b. The Applicability of State Law

 Defendants argue that *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), and Fifth Circuit precedent following that case permit this court to evaluate the reasonableness of the stop of defendants' vehicles under Texas law. A review of the history of the Fourth Amendment and its exclusionary rule demonstrates that the propriety of using state law to determine the validity of a traffic stop in a federal criminal case is uncertain.

 It is black letter law that the Fourth Amendment forbids the introduction of illegally seized evidence in a federal prosecution. Failure to employ the exclusionary rule as a remedy for Fourth Amendment violations renders "the protection of the Fourth Amendment against such searches and seizures ... of no value, and, so far as those thus placed are concerned, might as well be stricken from the

---

**2.** One noted commentator has described this latter approach, which focuses on what an officer legally *could* have done as opposed to what a reasonable officer *would* have done under the circumstances, as "poorly reasoned". 1 Wayne R. LaFave, *Search and Seizure* § 1.4, at 94 (2d ed. 1987 & Supp.1992).

**3.** The position of the Third Circuit in *United States v. Hawkins,* 811 F.2d 210, 217 (3rd Cir. 1987), *cert. denied,* 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1988), is ambiguous. That case did not raise the issue of whether the stop was pretextual but rather whether a legitimate stop was invalidated if the officer tells the suspect a pretextual reason for the stop. However, the court cited two cases following the "reasonably would have stopped" approach: *United States v. Smith,* 799 F.2d 704 (11th Cir.1986); *United States v. Cruz,* 581 F.2d 535, 541–42 (5th Cir. 1978) (en banc), *overruled by Causey,* 834 F.2d 1179 (5th Cir.1987) (en banc).

The Fourth Circuit has explicitly declined to decide which approach to adopt. *United States v. Burney,* 937 F.2d 603 (4th Cir.1991) (stop not pretextual under either test).

Constitution." *Weeks v. United States,* 232 U.S. 383, 393, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914). In *Weeks,* the Court held that the Fourth Amendment applied only to evidence seized under federal authority that the government sought to introduce in federal court. *Weeks,* 232 U.S. at 398, 34 S.Ct. at 346.

*McNabb v. United States,* 318 U.S. 332, 340–41, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943), established that the principles governing the admissibility of evidence in federal criminal trials are not restricted to those derived solely from the Constitution and compelled by the Fourth Amendment. The Supreme Court reasoned that a federal court would be empowered to exclude evidence seized by federal officers in an illegal but not unconstitutional manner, based upon its inherent supervisory powers.

In *United States v. Di Re,* the Court rejected the proposition that the validity of a warrantless arrest by a federal officer for a federal crime should be a matter of federal law to be determined by uniform rule applicable in federal courts. 332 U.S. 581, 589, 68 S.Ct. 222, 226, 92 L.Ed. 210 (1948). Noting the absence of a federal statute governing warrantless arrests, the Court held that the law of the state where the arrest occurs determines its validity. *Id.* The Court later held that the *Di Re* rule rested on the Fourth Amendment, rather than upon the supervisory power over the admission of evidence. *Ker v. California,* 374 U.S. at 37, 83 S.Ct. at 1631.

■ *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), ruled that the due process clause of the Fourteenth Amendment prohibited unreasonable searches and seizures by state officials, but that the Fourteenth Amendment did not require the adoption of an exclusionary rule in state court proceedings. 338 U.S. at 27–28, 69 S.Ct. at 1361. After *Wolf,* there existed a paradoxical regime where a federal court could not admit evidence obtained in violation of the Fourth Amendment but did not need to suppress materials secured in violation of the Fourteenth

Amendment. This was the so called "silver platter" doctrine.

*Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), resolved this anomaly. The Supreme Court, pursuant to its supervisory powers, forbade the admission in a federal court of evidenced seized in violation of the Fourteenth Amendment but not the Fourth. *Elkins,* 364 U.S. at 216, 223, 80 S.Ct. at 1443, 1447. The Court also held that the Fourth Amendment did not allow for the consideration of state law in the determination of whether a search for and seizure of *evidence* was constitutionally reasonable:

> In determining whether there had been an unreasonable search and seizure of evidence by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. *The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.*

364 U.S. at 223–224, 80 S.Ct. at 1447 (emphasis added). The Court subsequently has interpreted the above test to mean that the question of whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers. *Preston v. United States* 376 U.S. 364, 366, 84 S.Ct. 881, 882–83, 11 L.Ed.2d 777 (1964) (citing *Elkins* ).

In *Elkins,* Justice Frankfurter, on behalf of four dissenters, noted the majority's formulation of the Fourth Amendment allowed the fruits of searches and seizures illegal under state but not federal law to be admitted in federal courts. *Elkins,* 364 U.S. 206, 245, 80 S.Ct. 1453, 1460, 4 L.Ed.2d 1688 (1960) (Frankfurter, J., dissenting). Directly relevant to the defendants' contentions in this case, Frankfurter wrote:

> A state officer who disobeys [a state law] needs only to turn his evidence over to the federal prosecutor, who may free-

ly utilize it under today's innovation in disregard of the disciplinary policy of the State's exclusionary rule. I cannot think why the federal courts should thus encourage state illegalities.

*Id.* at 245–46, 80 S.Ct. at 1460 (Frankfurter, J., dissenting). Frankfurter proposed that federal courts suppress evidenced obtained in violation of state law out of comity, as a rule of evidence, apparently under their supervisory powers. *Elkins,* 364 U.S. at 250, 80 S.Ct. at 1462.[4]

*Elkins* was decided prior to *Mapp v. Ohio,* where in overruling *Wolf,* the Court held that any evidence obtained by searches and seizures in violation of the Constitution is inadmissable in a state court. 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961). The *Mapp* Court also reaffirmed that there were, in essence, two federal exclusionary rules: one constitutionally required as an essential ingredient of the Fourth Amendment, and a broader evidence rule derived from a federal court's supervisory powers. 367 U.S. at 649–51, 81 S.Ct. at 1688–89.

In *Ker v. California,* the Court determined that the reasonableness standards under the Fourth and Fourteenth Amendments were the same, and that a federal court should apply federal constitutional standard of reasonableness in all suppression motions. 374 U.S. 23, 34, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963) (majority opinion). In addition, the Court extended its prior holding in *Di Re,* and eight justices agreed upon the proposition that, un-

der the Fourth Amendment, the lawfulness of a warrantless arrest by state officers for a state offense is determined by state law, in so far as the law itself is not violative of the Constitution. 374 U.S. at 37, 83 S.Ct. at 1631–32 (plurality opinion); 374 U.S. at 62, 83 S.Ct. at 1644 (Brennan, J., concurring and dissenting).

After *Ker* it was clear that state law is irrelevant to a determination of the Fourth Amendment reasonableness of searches and seizures, except for warrantless arrests, where state law governs,[5] unless the particular state law covering warrantless arrests is itself unconstitutional. *Accord United States v. Rickus,* 737 F.2d 360, 363–64, 364 n. 2 (3rd Cir.1984) (federal law governs validity of warrantless search for evidence, but state law governs warrantless arrest under *Di Re* and its progeny). *Cf. California v. Greenwood,* 486 U.S. 35, 43, 108 S.Ct. 1625, 1630, 100 L.Ed.2d 30 (1988) ("We have never intimated, however, that whether a *search* is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the *search* occurs." (emphasis added)).

A legion of cases exists in nearly every federal judicial circuit which recites that state law is irrelevant to a federal court's determination of the constitutional reasonableness of searches for and seizures of *evidence.*[6] However, the Fifth Circuit has explicitly declined to rule the that federal law alone governs the legality of a search

---

4. Indeed, it could be argued that the very reasons that the Court gave for abolishing the "silver platter" doctrine argue for the suppression in federal court, of evidence obtained in violation of state law. As the majority noted: "[t]he very essence of healthy federalism depends upon the avoidance of needless conflict between state and federal courts." *Elkins,* 364 U.S. at 221, 80 S.Ct. at 1446. The Court recognized that having a lower federal standard for the admission of evidence seized by state officers induced subterfuge on the part of law enforcement to ensure the weaker test would be applied. *See Id.* at 222, 80 S.Ct. at 1446–47. But Justice Frankfurter noticed that law enforcement authorities would have a similar incentive to obtain a federal forum, if a state court and a federal court have differing standards for the admission of evidence seized by state officers.

5. Apparently, *Ker* contemplated that probable cause for a warrantless arrest would itself be evaluated with reference to state law, since the Court cited California and federal law for the standard to be applied in evaluating the justification for the arrest at issue there. 374 U.S. at 35, 83 S.Ct. at 1631 (plurality opinion). *Accord United States v. Wynn,* 544 F.2d 786, 788 (5th Cir.1978).

6. *E.g., United States v. Maejia,* 928 F.2d 810, 815 (8th Cir.1991); *United States v. Soule,* 908 F.2d 1032, 1039 n. 13 (1st Cir.1990); *United States v. Rowell,* 903 F.2d 899, 901–02 (2nd Cir.1990); *United States v. Mastrangelo,* 733 F.2d 793, 799 (11th Cir.1984); *United States v. Combs,* 672 F.2d 574, 578 (6th Cir.), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982).

connected to a federal prosecution. *United States v. Moore*, 743 F.2d 254, 256 (5th Cir.1984). In *Moore*, the panel evaluated the search warrant under Texas law, and found it to have been issued lawfully. From the panel's failure to mention the Constitution, it must be concluded that the *Moore* court employed Texas law in furtherance of its supervisory powers over the admission of evidence rather than in the context of a Fourth Amendment analysis.[7] *See also United States v. Freeman*, 897 F.2d 346, 348 (8th Cir.1990) (analyzing warrant under both federal and state law, apparently under supervisory power).

The Supreme Court has recognized the continuing validity of the use of the supervisory powers to exclude evidence seized illegally but constitutionally. *See United States v. Payner*, 447 U.S. 727, 735 n. 7, 100 S.Ct. 2439, 2446 n. 7, 65 L.Ed.2d 468 (1980) (confirming the ability of lower courts to supervise the "administration of criminal justice" among the parties, and, therefore, rejecting the application of the supervisory power to suppress evidence seized from third parties). Situations involving allegations of the wilful disregard of state law are particularly appropriate occasions for the use of the supervisory power. *Id.* at 734–35, 100 S.Ct. at 2445–46. *But see United States v. Sutherland*, 929 F.2d 765, 770–71 (1st Cir.1991) (in context of wiretap evidence, court would decline to exclude even in cases of flagrant abuse of state law by state officials).[8]

■ It has not been resolved whether traffic seizures not amounting to formal arrests are governed for Fourth Amendment purposes by state law under *Di Re—Ker* or exclusively by federal standards under *Elkins—Preston*. In *United States v. Ramos*, 733 F.Supp. 260, 261–62 (S.D.Tex.1989), the court concluded that federal law governed such situations. However, the *Ramos* judge believed that *Di Re* was no longer good law, based upon *Elkins—Preston*.[9] As noted above, the Supreme Court reaffirmed and extended *Di Re* in the *Ker* case, which was decided four years after *Elkins* and only nine months before *Preston*. Moreover, the Court cited *Di Re* as good law only last term. *California v. Acevedo*, —— U.S. ——, 111 S.Ct. 1982, 1994, 114 L.Ed.2d 619 (Stevens, J., dissenting).[10]

In the present case, there is no need to resolve the difficult question of whether traffic stops should be analyzed under *Elkins—Preston* or *Di Re— Ker* for Fourth Amendment purposes.[11] Because Supreme Court and Fifth Circuit precedents permit the consultation of state law in the exercise of a federal court's supervisory powers over the administration of justice among the parties, the validity of the vehicle stops under Texas law will be considered.

7. The Fifth Circuit has also looked to state law to determine whether the person executing the search warrant had the *authority* to do so. *E.g., United States v. Martin*, 600 F.2d 1175, 1182 (5th Cir.1980), *overruled on other grounds by United States v. McKeever*, 905 F.2d 829, 833 (5th Cir. 1990); *United States v. Fossler*, 597 F.2d 478 (5th Cir.1979).

8. The admission of wiretap and electronic evidence is a special category, since there is a federal statute governing wiretap evidence that itself encompasses state law: 18 U.S.C. § 2511(2)(c). This is the reverse of the warrantless arrest situation: *Di Re—Ker* explicitly relied on the absence of any federal statute as a justification for the resort to state law. In regards to a federal court's evaluation of the methods whereby electronic evidence has been obtained, it has long been clear that federal law governs exclusively. *United States v. Nelligan*, 573 F.2d 251, 253 (5th Cir.1978).

9. The *Ramos* judge noted that in *dicta* in *United States v. Mahoney*, 712 F.2d 956, 959 n. 3 (5th Cir.1983), *cert. denied* 468 U.S. 1220, 104 S.Ct. 3590, 82 L.Ed.2d 887 (1984), the panel noted without approval a 1971 Tenth Circuit decision concluding that *Elkins* had overruled *Di Re.*

10. *See also Ybarra v. Illinois*, 444 U.S. 85, 94–96, 100 S.Ct. 338, 343–44, 62 L.Ed.2d 238 (1979), for an extended discussion of *Di Re.*

11. As noted above, one of the reasons for the *Di Re—Ker* rule is that all the states have warrantless arrest statutes and there is no uniform federal law of warrantless arrests. The same consideration does not apply with full force to warrantless traffic stops falling short of formal arrests. However, by their terms *Elkins–Preston*, as well as *Greenwood*, confine themselves to searches for and seizures of *evidence* and not *persons.*

### c. Texas law

■ Texas law governing pretext stops is in a state of flux, and it is not possible to state definitively what legal standards are to be applied. A majority of the Texas Court of Criminal Appeals has not firmly adopted one of the three possible analytical frameworks:

a) An objective approach examining whether the stop was objectively, legitimately authorized. This is the Fifth Circuit's rule. It has been adopted by a plurality of the Texas Court of Criminal Appeals, *Gordon v. State*, 801 S.W.2d 899 (Tex.Crim.App.1990), and by most Texas courts of appeals applying that case.[12]

b) An objective approach focusing upon whether a reasonable officer would have made the stop under the circumstances: The leading view among the federal judicial circuits to have ruled on pretext stops.

c) A subjective approach, adopted by a plurality of the Texas Court of Criminal Appeals in *Black v. State*, 739 S.W.2d 240 (Tex.Crim.App.1987), and one Texas court of appeals after *Gordon*, i.e., *Mendez v. State*, 817 S.W.2d 861, 862 (Tex.Ct. App.—Houston [1st Dist.] 1991, no pet. h.)[13]

A case involving a pretext stop is currently before the Court of Criminal Appeals: *Bobo v. State*, 805 S.W.2d 493 (Tex.Ct. App.—Houston [14th Dist.], pet. granted 1991). Perhaps, an authoritative, majority opinion on the law of pretextual stops will

result. However, there is no need for this court to assume the role of Nostradamus and prognosticate which of the approaches summarized above will emerge as the law of Texas. Defendants' evidence does not demonstrate a pretextual stop under any of the rubrics referred to above.

■ Defendants spent considerable time at the hearing on the motions to suppress demonstrating Trooper Barry Washington's remarkable success in, and resulting notoriety for, interdicting drugs on Texas highways.[14] The defendants argue that Officer Washington is partially motivated in his conduct by a desire to continue his well-recognized interdiction activities. Assuming this is true, such a state of affairs merely would reflect that law enforcement often amounts to "a competitive enterprise of ferreting out crime," a fact recognized long ago by the Supreme Court. *See United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984) (quoting *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948)). Even if Officer Washington should be motivated to seek recognition for his superior drug interdiction abilities, this would do little to prove that his stops of the defendants' vehicles and defendants' subsequent detention were pretextual.

■ Defendants next argue that pretext is shown in this case because many of the characteristics of one or more of the defendants coincide with drug courier profiles inculcated to Washington via training films.[15] Three of these films were admit-

---

**12.** *Santos v. State*, 822 S.W.2d 338 (Tex.Ct. App.—Houston [1st Dist.] no pet. h.); *Miller v. State*, 815 S.W.2d 805, 810 (Tex.Ct.App.—Austin 1991, pet. ref'd); *Foster v. State*, 814 S.W.2d 874, 881 (Tex.Ct.App.—Beaumont 1991, pet. ref'd); *Bobo v. State*, 805 S.W.2d 493, 495 (Tex.Ct. App.—Houston [14th Dist.], pet. granted 1991).

**13.** The *Mendez* panel assumed that the granting of the petition in the *Bobo* case implied a reconsideration of *Gordon*. 817 S.W.2d at 862. The panel concluded that recent changes in the makeup of the Texas Court of Criminal Appeals boded the overturning of *Gordon*. *Id.* However, another panel of the same court of appeal recently held that the "pretext doctrine" no longer applies in Texas, under the authority of *Gordon*. *Santos v. State*, 822 S.W.2d 338 (Tex.Ct. App.—Houston [1st Dist.] no pet. h.).

**14.** For example, during a six month period ending December 31, 1989, Officer Washington received an "outstanding" evaluation for his drug enforcement activities. During that period he made nineteen seizures; thirty-seven arrests; interdicted 507 lbs. of marijuana, 10.5 kilograms of cocaine and $28,000.00. He received an award as Texas' non-narcotics peace officer of the year and special recognition by the Texas Attorney General. Washington is regularly called upon to make drug interdiction presentations to other departments.

**15.** These include a borrowed car, cars with Tennessee plates, and a divergence between the state issuing Thomas' driver's license and the state where the car he was operating was registered.

ted into evidence.[16] However, the United States Supreme Court has ruled that just because the elements of a situation that reasonably aroused an officer's suspicion match those in a drug courier profile, the Fourth Amendment is not violated. *United ed States v. Sokolow*, 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989). The existence of some correlation between the defendants and the basic drug courier profile is not a sufficient basis on which the stops can be invalidated.

Moreover, Officer Washington did not testify that he has compiled drug courier profiles. He did not testify that he used drug courier profiles in making his decision to stop defendants' vehicles, or relied upon such profiles in determining what subsequent investigative measures to take regarding the defendants. Consequently, the legality of an officer's explicitly relying upon drug courier profiles is not at issue in this case. *Cf. Valcarcel v. State*, 765 S.W.2d 412, 415–19 (Tex.Crim.App.1989) (testimony about use of drug courier profile not *per se* inadmissible but inherently prejudicial under circumstances).

 Finally, defendants argue that they were stopped because of their race and subjected to increased suspicion because Valencia is from Puerto Rican and Minotta is of Colombian birth. Regrettably, it must noted that the training film prepared by the Louisiana State Police Department, which officer Washington admitted seeing, explicitly exhorts officers to make traffic stops for the purpose of narcotics searches based, in part, on the color of the driver's skin. The film describes what to look for in attempting to pick out a drug courier: "males of foreign nationalities, mainly Cubans, Colombians, Puerto Ricans or other swarthy outlanders." [17] It is a statistical fact that the war on drugs has been waged disproportionately against persons of color. Yet, law enforcement intentionally predicated in any measure upon racial considerations is repugnant to this country's values of individual treatment and equal justice. If it were proven that a stop were intentionally based on race, serious constitutional issues would entail.

However, here there is *no* such proof. That all three defendants were minorities does not *per se* show a racially based stop. No evidence was submitted that Officer Washington stops a disproportionate number of racial minorities for traffic violations.[18] No proof was given that non-minorities are treated differently from the defendants when the officer makes a traffic stop. In short, there is no evidence in the record to show that officer Washington engages in any racially discriminatory law enforcement activities whatsoever. Mere exposure to discriminatory training films does not make one an intentional practitioner of racially motivated law enforcement.[19]

Therefore, it is found that the evidence in this case does not establish that the stops were illegally pretextual under any of the legal standards employed to make such evaluations. The stops of both vehicles were valid.

## II. *The Searches and Arrests*

### A. The Arrests of Valencia and Minotta on Marijuana Charges

After Trooper Washington had halted both vehicles, he called for law enforce-

---

16. The films explicitly instruct the officers to use traffic stops for the purpose of "mule-hunting", i.e. drug courier interdiction. They warn the officers not to make illegal pretext stops, but define a pretext stop as one with no legitimate basis. As noted above, this definition of pretext is not universally followed, though it is the law in the Fifth Circuit.

17. In addition, the film trains officers to ask themselves whether the person "fits the car", a veiled reference to the belief held by some that a person of color in an expensive car is engaged in suspicious activity.

18. It is of little significance that Washington is himself Black. As the Supreme Court has recognized, it is irrelevant to a claim of illegal discrimination that those engaging in the conduct and those victimized are minorities, even if they are part of same group. *Castaneda v. Patrida*, 430 U.S. 482, 499, 97 S.Ct. 1272, 1282, 51 L.Ed.2d 498 (1977).

19. While not explicitly racially based, the New Mexico training makes questionable generalizations about the ethnic make up of drug traffickers. The Illinois film states that one cannot make an accurate prediction of the ethnicity of a drug courier.

ment back-up. First to arrive was Carthage Police Officer Carl Mazzola, who had been parked nearby on the other side of Loop U.S. 59 watching for speed limit violators. Mazzola stopped behind the automobile occupied by Valencia and Minotta. Meanwhile, Washington ran a routine check of Thomas' Texas driver's license. Washington then interviewed Thomas, who had stepped to the rear of his car, near the front of the trooper's patrol car.

The officer's recitation of the next series of events varies considerably from Thomas'. Thomas maintains that as soon as officer Washington emerged from the car, the trooper handcuffed him. Washington specifically denied this, and his testimony was corroborated by three other persons who had been present at the scene. The resolution of this issue is crucial to the legality of the subsequent police actions.[20] Based on the testimony at the hearing, it is found Thomas was not handcuffed at this time.

Washington states that he told Thomas he had been stopped on account of the safety belt violation. He then asked Thomas where the latter was going and whether the second vehicle was travelling with him. Washington recalls that Thomas told him that he was going to leave the car he had borrowed at his brother's residence in Memphis, Tennessee. Further, Thomas stated that the other car was travelling with him to give him a ride back to Houston, whence they all had come the day before. In contradiction to Washington, Thomas testified that he related to Washington that he had met Valencia and Minotta only a couple of hours before, at a rest stop, and that they were not travelling together. Thomas claims the officer never mentioned a safety belt violation, but told him he was "in trouble" if the package thrown from the second car was what the officer thought it to be.

Washington left Knight, his civilian passenger, "to keep an eye on" Thomas. Knight had access to a loaded shotgun which he had removed from Washington's gun rack and placed on the front seat of the patrol car, at the officer's instruction.[21] The trooper then walked back to the second vehicle to inquire about the package thrown form the car. Both defendants Valencia and Minotta denied the existence of any package, and further denied that they were travelling with Thomas. Washington then left Valencia and Minotta with Officer Mazzola, returned to his car, and drove back to where he had remembered the package to have been thrown by Minotta. Washington soon found, at the side of the road, a bag full of marijuana and rolling papers. While Washington was searching, Deputy sheriffs Paul Beatty and Byron Macmillan responded to his earlier call for back-up. After the discovery of the contraband bag, all three officers returned to the second vehicle and both Minotta and Valencia were put under arrest for misdemeanor marijuana possession in violation of Texas law.

As concluded in section I.B.2.b, the legality of a warrantless arrest is determined by state law, under the rule of *Di Re–Ker.* Fifth Circuit precedent also holds this to be the rule.[22] *United States v. Wynn*, 544

---

**20.** The Supreme Court has made clear that police cannot verify their suspicions of criminal activity by means that approach the conditions of arrest. *Florida v. Royer*, 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion).

**21.** Defendant Thomas correctly contends that he was being detained at this time because objectively he was not free to leave. Thomas undoubtedly was subjected to an on-going Fourth Amendment seizure from the time he turned his car off the road at Washington's order. *See California v. Hodari D., supra.* However, Washington's brief detention of Thomas while he investigated the second vehicle was not an arrest, but a reasonable and legitimate investigatory procedure.

**22.** In the context of a civil action under 42 U.S.C. § 1983, the Fifth Circuit in *dicta* in *Fields v. City of South Houston, Tex.*, 922 F.2d 1183, 1189 n. 7 (5th Cir.1991), noted some authority questioning whether *Di Re* was a rule of constitutional origin or an exercise of supervisory power. Neither *Fields* nor the authorities cited therein makes reference to *Ker*, wherein the Supreme Court explicitly held *Di Re* to have been a Fourth Amendment decision. The Fifth Circuit in *Fields* also opined that *Greenwood* had sapped *Di Re* of constitutional dimension. As noted *supra*, *Greenwood* is in the *Elkins–*

F.2d 786, 788 (5th Cir.1978); *United States v. Robinson,* 650 F.2d 537, 538–39 (5th Cir. Unit B. 1981); *United States v. Garcia,* 676 F.2d 1086, 1089 (5th Cir.1982), *vacated and remanded* 462 U.S. 1127, 103 S.Ct. 3105, 77 L.Ed.2d 1360 (1983), *on remand* 719 F.2d 108 (5th Cir.1983).[23] *Compare United States v. George,* 883 F.2d 1407, 1415 n. 7 (9th Cir.1989) (citing *Ker* rule but since warrantless arrest violated federal law court saw no need to consider state law) *and United States v. Janik,* 723 F.2d 537, 548–49 (7th Cir.1983) (citing *Di Re* as rule for warrantless arrests), *with United States v. Loggins,* 777 F.2d 336, 338 (7th Cir.1985) (ignore state law regarding probable cause for warrantless arrest).

 In Texas, police officers must always obtain warrants except in the most limited of circumstances, and warrantless arrests are presumed to be unreasonable. *Smith v. State,* 739 S.W.2d 848, 851–52 (Tex.Crim.App.1987); *Dejarnette v. State,* 732 S.W.2d 346, 349 (Tex.Crim.App. [Panel Op.] 1987); *Wilson v. State,* 621 S.W.2d 799, 803–04 (Tex.Crim.App.1981). A police officer may arrest an individual without a warrant only if (1) there is probable cause with respect to that individual and (2) the arrest falls with in one of the exceptions in Article 14.01 through 14.04 of the Texas Code of Criminal Procedure. *Stull v. State,* 772 S.W.2d 449, 453 (Tex.Crim.App. 1989) (citations omitted). The burden to prove the validity of a warrantless arrest and the existence of circumstances making the procuring of a warrant impracticable is on the government. *Id.* at 453; *Smith,* 739 S.W.2d at 852.

 Probable cause for an arrest exists where, at that moment, the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information would warrant a reasonable and prudent person in believing that a particular person has committed or is committing a crime. *Smith,* 739 S.W.2d at 852. Texas Code of Criminal Procedure 14.01(b) establishes that an officer can make an arrest without a warrant for a misdemeanor only if the offense is committed within the officer's presence or view.

 Under Texas law, unlawful possession of a controlled substance consists

---

*Preston* line of cases, and is perfectly consistent with *Di Re–Ker,* since it confines itself to *evidentiary searches* only. 486 U.S. at 43, 108 S.Ct. at 1630.

In an aside, the *Fields* panel speculated whether the use of state law as part of a federal court's supervisory power was still viable after the *Payner* decision, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). However, as noted *supra, Payner* explicitly reaffirmed the use of the supervisory power in the administration of justice between the parties at bar. The panel's comments were all *dicta,* because it held, whatever the validity of *Di Re* and the Fifth Circuit cases following it, they applied only to criminal prosecutions and not civil rights actions.

**23.** On the authority of *Di Re–Ker, Garcia* reversed the defendants' convictions because the officer involved lacked the authority to make warrantless arrests under Texas law. In addition, the *Garcia* court refused to apply a good faith exception to the officer's actions, because the law of Texas did not have one. 676 F.2d at 1093.

The Supreme Court summarily vacated the opinion for "further consideration" in light of *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (establishing the automobile exception to the warrant requirement). *United States v. Garcia,* 462 U.S. 1127, 103 S.Ct. 3105, 77 L.Ed.2d 1360 (1983). Justice Stevens dissented, noting that the indictments had been dismissed voluntarily by the government, and therefore, no case remained.

Soon thereafter, a panel of the Fifth Circuit concluded that the "garbled" message of the *Garcia* remand was a repudiation of the use of state law in *administering* the exclusionary rule. *United States v. Mahoney,* 712 F.2d 956, 959 (5th Cir.1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3590, 82 L.Ed.2d 887 (1984). *Mahoney* did not consider the *Garcia* remand order to preclude a court from using state law to evaluate the legality of the underlying search or arrest in a federal prosecution.

Several months later, on remand, two judges on the *Garcia* panel stated that while they could "make nothing" of the Supreme Court's remand order in light of *Ross,* they thought, perhaps, they should not have applied state law. *United States v. Garcia,* 719 F.2d 108, 109 (5th Cir. 1983). Yet the panel remanded the case to the district court for further consideration of all possible issues, including, it seems, state law. In dissent, Judge Goldberg saw nothing in the Supreme Court's order that questioned the *Di Re–Ker* rule of applying state law to warrantless arrests and thought further action by the district court to be unnecessary. 719 F.2d at 109–110. Since the indictments had already been dismissed, there were evidently no further proceedings in the case.

of two elements: (1) there must be the exercise of care, control and management over the contraband; and (2) knowledge that the matter was contraband. *Martin v. State*, 753 S.W.2d 384, 387 (Tex.Crim. App.1988). When a suspect is not in exclusive possession of the place where the contraband is found, there must be independent facts to affirmatively link the suspect with the contraband. *Gonzalez v. State*, 809 S.W.2d 778, 780 (Tex.Ct.App.—Houston [14th Dist.] 1991, pet. ref'd). Mere presence at the place where the contraband is being used or possessed by others does not make one a party to an offense. *Martin*, 753 S.W.2d at 386. Possession is more that being "where the action is". *Castellano v. State*, 810 S.W.2d 800, 805 (Tex.Ct.App.— Austin 1991, no pet. h.).

██ Based on Washington's and Knight's testimony that Minotta threw a package out of the car and the officer's subsequent discovery of a bag of marijuana near the site where Minotta tossed the package, it is concluded that Minotta committed the offense of the possession of marijuana in view of the trooper. Minotta's warrantless arrest was proper. This case is unlike the situation in *Gonzalez*. There, a key holder containing cocaine was found in the general vicinity of a vehicle stuck in a ditch on a highway. No other evidence connecting the key holder with the vehicle existed and, therefore, no possession could be found. 809 S.W.2d at 780. Here, while the marijuana was discovered in a ditch on a public highway, its proximity to where Minotta had thrown a package provides an affirmative link sufficient to show possession.

Valencia's arrest for marijuana possession is a different matter. The Texas Court of Criminal Appeals has developed a list of more than a dozen factors to be applied to determine whether there is possession of drugs found in (here thrown out of) a vehicle by an automobile occupant. *See Whitworth v. State*, 808 S.W.2d 566, 569 (Tex.Ct.App.—Austin 1991, pet. ref'd). The logical force of a set of factors depends upon the degree to which they tend to affirmatively link a suspect to the con-

traband. *Id.* Although the cases setting forth and applying these factors arise in the context of whether possession was proven beyond a reasonable doubt, the factors themselves provide a useful benchmark in determining whether an offense was committed in an officer's presence and whether there was probable cause to arrest.

The only linking factor of significance in this case was that Valencia was the driver of the vehicle in which the marijuana was at one point situated. The Texas Court of Criminal Appeals has consistently ruled that possession of drugs by a passenger cannot establish drug possession as to the driver. *Martin v. State*, 753 S.W.2d at 388; *Heltcel v. State*, 583 S.W.2d 791 (Tex. Crim.App.1979). The absence here of some of the factors usually indicative of possession is noteworthy. Of salience is the fact that Officer Washington did not testify that he smelled marijuana in the car in which Valencia was travelling, but noted that the recovered bag itself exhibited a strong odor. The smell of marijuana in the place where the contraband was stored is often crucial to establishing a vehicle occupant's possession of it. *See, e.g., Whitworth v. State*, 808 S.W.2d at 569; *Christopher v. State*, 639 S.W.2d 932, 935 (Tex. Crim.App.1982), *overruled on other grounds by Preston v. State*, 700 S.W.2d 227 (Tex.Crim.App.1985); *Trejo v. State*, 766 S.W.2d 381, 385 (Tex.Ct.App.—Austin 1989, no pet.); *Herrera v. State*, 745 S.W.2d 527, 528 (Tex.Ct.App.—Corpus Christi 1988, pet. ref'd).

██ Moreover, when confronted with the marijuana bag, Minotta confessed it was his alone, and Valencia denied any knowledge of the drugs. Officer Washington testified that he did not credit these statements, but the defendants' declarations hardly provide an affirmative link between Valencia and the contraband. Finally, as noted earlier, the drugs were thrown from the passenger side of the vehicle by the passenger. Under the circumstances, there were no affirmative links between Valencia and the contraband. Valencia simply did not commit an offense in the

officer's view or presence justifying his arrest on marijuana charges, and, therefore, Officer Washington could not effectuate a warrantless arrest lawfully under the circumstances. *Cf. Stull v. State*, 772 S.W.2d at 452–53.

### B. The Consent Search of Thomas' Car and His First Arrest

After placing Valencia and Minotta under arrest, Washington walked back to defendant Thomas. Washington states that he told Thomas about the discovery of the contraband in the second car and asked Thomas whether there were any drugs in his car. Thomas stated there were none. The trooper recalls that he asked Thomas whether the latter "would have a problem" if the officer looked inside the car. Thomas allegedly said he did not have a problem with such action. Then Washington told Thomas that he would be handcuffed for his own and the officer's protection, and thereupon, the trooper manacled the suspect. Washington began his search of Thomas' car, and discovered a marijuana cigarette butt in the rear ashtray. Thomas was placed under arrest for marijuana possession, given his *Miranda* warnings and searched. Rolling papers matching those in the package tossed by Minotta from the second car were discovered on Thomas' person.

Thomas' version of the events leading up to his arrest varies considerably from Washington's. He maintains that Washington never asked for permission to search the vehicle but commenced the search on his own initiative by taking Thomas' keys from the ignition. Thomas claims the marijuana butt was discovered only later by Officer Mazzola's drug dog, Argos,[24] after the canine had been placed in the car. Resolution of these factual discrepancies is critical to the determination of the legality of the law enforcement procedures employed.[25] Based upon careful weighing of the conflicting testimony, it is found that the Officer Washington's account of the events is the more credible scenario.

 But finding that Washington asked for permission to search the car is only the beginning rather than the end of the inquiry. The state must show that Thomas consented to the search and that such consent was, in fact, freely and voluntarily given, based on the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1972). The burden is on the prosecution to so prove by a preponderance of the evidence. *Bumper v. North Carolina* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Hurtado*, 905 F.2d 74, 75–76 (5th Cir.1990). The standard for interpreting consent under the Fourth Amendment is objective reasonableness. *Florida v. Jimeno*, —— U.S. ——, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991). Trooper Washington was entitled reasonably to interpret Thomas' statement that he had no problem with a search of the car as consent to search. The salient question is whether Thomas' consent was voluntarily obtained.

The United States Court of Appeals for the Fifth Circuit has articulated the six primary factors that must be considered in determining whether consent was voluntary:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of defendant's co-operation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Gonzalez–Basulto*, 898 F.2d 1011, 1013 (5th Cir.1990) (citing *United States v. Galberth*, 846 F.2d 983, 987

---

**24.** Argos was the name of the dog in Homer's *Odyssey* who recognized his master Odysseus, when the latter returned home after years of wanderings.

**25.** If Washington had requested Thomas sign a written "Consent to Search" form, the critical issue of whether Thomas gave consent to search could have been resolved based on something other than Washington's and Thomas' respective credibility.

(5th Cir.), *cert. denied*, 488 U.S. 865, 109 S.Ct. 167, 102 L.Ed.2d 137 (1988)). Because it previously has been held that Thomas' detention until the point where he was asked to give consent to search was wholly legal, no elevated burden for proof of voluntariness falls upon the government. *Cf. United States v. Melendez-Gonzalez*, 727 F.2d 407, 414 (5th Cir.1984) (higher standard of proving consent was voluntary where it followed an illegal arrest).

 When he consented to the vehicle search, Thomas was being detained for investigative purposes in a manner recognized as a seizure under Fourth Amendment. Consent obtained during an investigative detention is not *per se* involuntary. *See Florida v. Royer*, 460 U.S. at 502, 103 S.Ct. at 1326–27. However, such involuntary custody can weigh against a finding of free and voluntary consent. Here, Officer Washington had not issued Thomas a citation for the safety belt violation at the time he sought consent to search, and indeed none was ever given to Thomas. Washington's failure to issue the citation for the traffic violation furnishing the foundation for the initial stop at the time consent was sought does not *per se* transform Thomas' detention into an illegal arrest in the manner that an officer's retention of a driver's license might. *Cf. Florida v. Royer*, 460 U.S. at 503, 103 S.Ct. at 1327 (plurality opinion).

However, Washington's failure to issue the citation is a factor to be considered, because a detained person could form the impression that yielding to the search request might influence the officer to let him off with a warning rather than a costly ticket. Furthermore, a person stopped for a traffic violation assumes that the citation will be issued quickly so that he can continue his journey and that a long detention resembling an arrest is unlikely. *Berkermer v. McCarty, supra*, 468 U.S. at 437, 104 S.Ct. at 3148–49. While in other circumstances a long delay in the issuance of the citation might constitute an arrest vitiating consent to search, here Thomas was not free to leave the scene in any event, because Officer Washington was conducting a legitimate investigation of whether Thomas was connected with the drugs thrown from the second car. The coercive effect of the failure to issue the citation upon the decision to give consent to search in this instance was minimal.

Actually coercive police procedures, the second *Gonzalez–Basulto* factor, were absent here. According to Washington and Knight, Thomas cooperated fully with all the prior orders and requests he had been issued. This weighs in favor of voluntariness, but Washington's failure to inform Thomas of his right to refuse consent is a factor on the other side of the balance. Thomas' high school education and intelligence were such that he would have readily understood the significance of the Trooper's requests. Thomas had the capacity to consent freely.

Finally, as is discussed below, it is likely that Thomas believed no incriminating evidence, such as the marijuana, would be found by a "look inside the car." Even if it is assumed that Thomas knew about the cocaine later found to have been concealed in the car's rear side panels, his consent to a search of the inside of the car would not have reasonably extended to the opening of the quarter-panels. *United States v. Garcia*, 897 F.2d 1413, 1419–20 (7th Cir.1990). *See also United States v. Ibarra*, 948 F.2d 903, 907 (5th Cir.1991) (consent does not extend to the creation of access into a closed chamber but will encompass removal of blockage to an existing access path). Therefore, the sixth *Gonzalez–Basulto* factor weighs in favor of voluntary consent, since Thomas would have believed that an authorized consent search would not have discovered the secreted contraband. Under the totality of the circumstances, the government has met its burden of proof that Thomas' consent was freely and voluntarily given.

 According to the testimony of Officer Washington, Thomas was immediately handcuffed after he consented to the search. In the absence of a showing by the government that restraints such as handcuffing are necessary to protect the

safety of officers or the public, the handcuffing of a suspect is an arrest and must be supported by probable cause. *United States v. Glenna*, 878 F.2d 967, 972 (7th Cir.1989) ("the thought of allowing police officers to handcuff person where probable cause is lacking is a troubling one"); *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir.1990). *Cf. United States v. Campbell*, 942 F.2d 890, 892 (5th Cir.1991) (only permissible *Terry* stop occurred even though restraints were those usually reserved for formal arrest, where danger to police or other persons existed).

■ Officer Washington conceded that Thomas was fully cooperative and the trooper further testified that he had possessed no information or belief that the suspect was either armed or dangerous. Thomas posed no threat to the public. There were three armed officers and Knight to restrain Thomas in the event any trouble occurred. Valencia and Minotta were already handcuffed and not close at hand. The government has not shown that handcuffing the defendant was justified or reasonable under the circumstances. Furthermore, it cannot be said that Thomas consented to the cuffing, but rather, he seems to have acquiesced to Officer Washington's authority. Therefore, it must be concluded that Thomas was unlawfully placed under arrest by officer Washington when the trooper handcuffed him without reasonable justification.

■ The effect of Washington's impermissible use of handcuffs on the subsequent search must be examined. Voluntary consent to search of the vehicle had already been given.[26] The discovery of the marijuana cigarette butt in the rear ashtray was not obtained through an exploitation of the illegal arrest. However, an illegal arrest after voluntary consent to search in some situations might amount to interference with the right to revoke consent, or be relevant to the consideration of whether the search was within the scope of the consent. *See United States v. Kelly*, 913 F.2d 261, 266–67 (6th Cir.1990). Here, Thomas made no attempt whatsoever to revoke consent after his unlawful arrest, and Thomas was not placed in a position where a change of heart was impossible to communicate to the officer. Therefore, the search of the car was not a fruit of the unlawful handcuffing, and consent was not vitiated by this illegality. Furthermore, the search of the rear ashtray would have been contemplated by a reasonable person giving consent, and so the discovery and seizure of the marijuana was within the scope of the authorized search. *See Florida v. Jimeno*, —— U.S. ——, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).

Based on the discovery of the marijuana butt in the rear ashtray, Thomas was placed formally under arrest for marijuana possession. In section II.A the proper test for a warrantless misdemeanor arrest was set forth. Based on the law of Texas, it must be concluded that Thomas did not commit the offense of marijuana possession in the presence of or in view of Trooper Washington and that this arrest was unlawful. Especially instructive is the case of *Humason v. State*, 728 S.W.2d 363 (Tex. Crim.App.1987). There, a defendant was arrested for a traffic violation. An unzipped gym bag, apparently not belonging to the defendant, had been lying next to him on the front seat of the truck. Buried underneath the clothes in the bag was a vial of cocaine. The Court of Criminal Appeals reversed the defendant's conviction for drug possession, on the basis that the only connection between him and the drugs was proximity. 728 S.W.2d at 366–67 (plurality opinion).

■ Here, the affirmative links between Thomas and the contraband were far fewer than in *Humason*. The marijuana cigarette butt was in the rear ashtray, a rather inconvenient place for a driver to place it. Thomas credibly testified that he had spent the previous night sleeping in the

---

**26.** It is clear that had Washington placed Thomas in handcuffs before the consent to search was given, he would have been illegally under arrest, and such consent would likely have been involuntary under the circumstances. *See Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

front seat of the car, not the back. The car did not belong to Thomas, and he had begun driving it only the day before. There is no evidence that he had exercised control over or had knowledge concerning the use of drugs in the back seat by other persons. Officer Washington did not testify that there was a smell of marijuana in the car. Had the cigarette been recently smoked, a detectable odor would have remained. Thus, under the circumstances, Thomas' warrantless arrest for marijuana based solely on the discovery of cigarette butts in the rear ashtray was unlawful.

The arrest cannot be saved on the basis of objective good faith on the part of the officer. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. Williams,* 622 F.2d 830, 840 (5th Cir.1980) (en banc), *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981).[27] The good faith exception applies to warrantless arrests. *United States v. De Leon Reyna,* 930 F.2d 396, 400 (5th Cir.1991). However, the good faith exception has never been applied to a situation where the police mistakenly believe the facts justify an arrest when in fact they do not. Such an application is not logically related to the reasons for the exception. *See Leon,* 468 U.S. at 913–25, 104 S.Ct. at 3415–21. Furthermore, in most situations a warrantless arrest cannot be without probable cause and yet reasonable.

Even assuming that a misdemeanor arrest in violation of state law is not, by definition, unreasonable under the Fourth Amendment under the *Di Re–Ker* principle, the arrest of Thomas for marijuana possession based on the facts of the situation was objectively unreasonable. Washington's arrest of Thomas, who was driving an automobile which he had borrowed only the day before, for drug possession charges based upon the discovery of a marijuana butt of unknown vintage in the rear ashtray does not comply with the Fourth Amendment's reasonableness requirement. With due respect to the officer, such an arrest does not demonstrate objective good faith. ·

The rolling paper was discovered on Thomas' person pursuant to a search incident to his illegal arrest. Because it was a direct result of an illegality, it must be suppressed. *Wong Sun v. United States,* 371 U.S. 471, 495, 83 S.Ct. 407, 421, 9 L.Ed.2d 441 (1963). Its seizure cannot be salvaged under the doctrine of inevitable discovery. *United States v. Murray,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). For the "inevitable discovery" exception to the exclusionary rule to apply, the government must prove by a preponderance of the evidence (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial alternative line of investigation at the time of the constitutional violation. *United States v. Lamas,* 930 F.2d 1099, 1102 (5th Cir.1991) (citing *United States v. Cherry,* 759 F.2d 1196, 1205–06 (5th Cir.1985), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987)). The inevitable discovery exception involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment. *Nix v. Williams,* 467 U.S. 431, 445 n. 5, 104 S.Ct. 2501, 2509 n. 5, 81 L.Ed.2d 377 (1984).

Here, the government has not met its burden that the process by which the unlawfully seized evidence otherwise would have been discovered was under way at the time of the constitutional violation. Even though the law enforcement officers here would have possessed probable cause to conduct a further search of Thomas' car in the absence of the discovery of the rolling papers on his person, the search of the car for drugs had not yet commenced. It cannot be said that further search *inevitably* would have occurred if the rolling papers matching those tossed from the second car had not first been discovered. A search of Thomas' person would not have been part of such an investigative procedure in any event. In determining the applicability of the inevitable discovery exception, a court

---

**27.** Federal law controls the administration of the exclusionary rule; consequently, Texas' law

of good faith is not relevant. *See Mahoney,* 712 F.2d at 959.

may not speculate about what searches a law enforcement officer might have conducted absent a constitutional violation.

### C. The Discovery of the Cocaine and Thomas' Second Arrest

After finding the marijuana butt in the rear ashtray, Washington then employed Officer Mazzola's dog, Argos, to sniff out more contraband. According to Mazzola, the dog's routine search pattern is to sniff the outside of the car, next the trunk, and then the inside passenger compartment. Apparently, the dog gave confusing signals in the trunk, but gave clear indications of contraband while it sat in the back seat. Washington and Officer Paul Beatty removed the lower portion of the back-seat of the car and the dog alerted strongly on the right side panel. Using a screwdriver, Washington pulled apart the right rear quarter-panel, revealing a package which he identified as cocaine. Money was found in the left rear quarter-panel through the same procedure. Thomas was placed under arrest for cocaine possession.

■■■ The use of a drug-sniffing dog to examine a closed box or container such as the fender of a car is not a search within the meaning of the Fourth Amendment. *United States v. Dovali–Avila*, 895 F.2d 206, 207–08 (5th Cir.1990) (citing *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)). No probable cause was necessary for the dog to sniff the outside of the car because the dog merely amplified the human olfactory capacity, which under the circumstances would not have been a search under the Fourth Amendment. *United States v. Lovell*, 849 F.2d 910, 914 (5th Cir.1988). For the very same reason, the placing of a dog inside the trunk and passenger compartment of a car must be considered an invasive search requiring probable cause. Just as an officer could not enter the passenger compartment or trunk of a vehicle to conduct a search without probable cause, neither can a canine be placed inside a car on less than this standard.

■■■ Here, the discovery of the marijuana butt in Thomas' vehicle provided probable cause to search elsewhere in the vehicle (including the trunk) for contraband, and the officers had a right to open closed containers within the car without obtaining a warrant. *California v. Acevedo*, —— U.S. ——, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *United States v. Reed*, 882 F.2d 147 (5th Cir.1989); *United States v. Loucks*, 806 F.2d 208, 209–11 (10th Cir.1986); *United States v. Burnett*, 791 F.2d 64, 67 (6th Cir.1986). The use of the dog, Argos, as a tool in the course of the search does not raise any further constitutional issues, as he acted as a mere extension of the officers' sensory faculties.

■■■ Argos' alerting inside the vehicle provided the officers with probable cause to conduct a further search of the back seat area. *See Dovali–Avila, supra*, 895 F.2d at 207. The removal of the back seat did not involve the destruction of property such that the procedure was unreasonable. Finally, the intrusive searches accomplished by the use of a screwdriver to pry back the exterior side panels so that the suspected contraband would be visible were reasonable under the circumstances of Argos' very strong alert in that area of the automobile.

■■■ Although it was concluded above that Thomas' arrest for marijuana possession and the consequent seizure of the rolling papers were invalid, the subsequent searches of his vehicle for cocaine and his arrest for possession thereof were not tainted by this unlawful arrest. Even if it could be said that Washington relied in some way on the discovery of the rolling papers in deciding to pursue the later search, the prior, lawful discovery of the marijuana butt provided sufficient cause for the second search.

■■■ As regards search warrants, it is the rule that when lawfully obtained evidence sufficient to support a search warrant is presented to a magistrate, there is no Fourth Amendment violation if the officer has also included in the affidavit evidence that was illegally obtained. *United States v. Williams*, 594 F.2d 86, 95 n. 17 (5th Cir.1979), *aff'd* 622 F.2d 830 (5th Cir.

1980) (en banc), *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981). The rule should be no different in the context of a search pursuant to a warrant exception. *See also United States v. Marchand,* 564 F.2d 983 (2nd Cir.1977) (if an officer has probable cause for warrantless arrest, it is irrelevant whether officer also has evidence obtained illegally), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978). The second search and Thomas' arrest for cocaine were not fruits of any illegality.

■ Finally, under the standards for warrantless felony arrests provided by Texas law, which are articulated *infra,* it cannot be contested that the discovery of drugs and currency inside Thomas' vehicle provided Officer Washington with probable cause to effect a warrantless arrest of defendant Thomas on felony drug trafficking charges.

### D. The Felony Arrests of Valencia and Minotta

Immediately after Thomas' arrest for cocaine possession, defendants Valencia and Minotta were arrested for the same offense. Defendant Minotta was already lawfully under arrest for marijuana possession, but for the reasons set forth in section II.A, *supra,* Valencia's previous arrest for marijuana possession was not valid. Valencia argues that the cocaine arrest justifying the subsequent seizure of incriminating evidence against him was a fruit of the previous, illegal arrest for marijuana possession.

The case of *United States v. Walker,* 535 F.2d 896, 899 (5th Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976), casts doubt on Valencia's contention. In *Walker,* the defendant was illegally arrested by one officer. Nothing incriminating was obtained as a result of this arrest. A few minutes later a second offi-

cer arrived, investigated, developed probable cause, and arrested the defendant again for the same offense. The Fifth Circuit reversed the district court's granting of the motion to suppress the evidence seized in the course of a search incident to the second arrest. The panel reasoned that the only nexus between the first and second arrests was the defendant's continued detention at the scene, and that the second arrest was based on an independent investigation by another officer. *Id.*

The panel did not find that the continued detention of the defendant itself an exploitation of the initial arrest, although "but for" the first arrest, the suspect might well have been free to leave the scene.[28] Although the instant case differs from *Walker* in that Officer Washington effected both the first and second arrests of Valencia, the offenses here were separate, in distinction from *Walker.* The salient point is, as in the *Walker* case, the only result of the initial illegality here was the easy availability of the defendant to the officer rather than the obtaining of any incriminating evidence or statement. *Cf. Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (confession obtained after illegal arrest tainted and taint not necessarily removed by *Miranda* warnings).

■ The *Walker* court made clear that an illegal initial arrest cannot always be cured by a subsequent, valid arrest. 535 F.2d at 899. However, the message of the *Walker* decision is that a lower court should not treat a second arrest as the fruit of an illegal one where the only exploitation of the initial illegality is the continuing presence of the defendant. Rather, a court should analyze whether the second arrest was itself supported by probable cause. *Id.; accord United States v. Clark,* 891 F.2d 501, 505–06 (4th Cir.1989) (even if permissible *Terry* stop becomes illegal arrest, later arrest based on probable cause

---

**28.** The *Walker* court did not attempt to salvage the initial arrest based upon an analysis of whether the circumstances warranted a *Terry* investigatory detention. Two circuits have explicitly held that where an arrest is not supported by probable cause, it cannot be upheld on the grounds that it would have been permis-

sible had it been a *Terry* stop. *United States v. Prieto–Villa,* 910 F.2d 601, 605 (9th Cir.1990); *United States v. Ceballos,* 654 F.2d 177, 181 (2nd Cir.1981). Therefore, whether Valencia's continued detention at the side of the road after his unlawful arrest could have been justified as investigatory procedure will not be considered.

obtained independently not fruit of primary illegality even though defendant might have left scene).

As previously noted in section II.A, *supra*, the government must show probable cause *and* a warrant exception for a warrantless arrest to be reasonable in Texas. These are distinct requirements. The facts within the knowledge of Officer Washington at the moment he placed Valencia under arrest for cocaine were as follows:[29] Washington had observed two nearly identical cars travelling in close proximity on U.S. 59;[30] marijuana had been tossed from the second car; the occupants had told inconsistent stories about whether they knew each other; cocaine had been found secreted in Thomas' automobile, the interior of which had been modified in an obvious way by the substitution of different color carpeting in the rear of the vehicle and the removal of screws from the interior sections of the side panels where cocaine had been found; the second car had screws missing from the same locations.

■■■■ It is certain one cannot make a search or seizure merely based upon the association or propinquity of a person with known or suspected criminals, or solely because of someone's proximity to contraband. *See Ybarra v. Illinois*, 444 U.S. 85, 91, 94–96, 100 S.Ct. 338, 342, 343–44, 62 L.Ed.2d 238 (1979); *Sibron v. New York*, 392 U.S. 40, 62–63, 88 S.Ct. 1889, 1902–03, 20 L.Ed.2d 917 (1968); *Di Re*, 332 U.S. at 583–87, 68 S.Ct. at 223–250. However, here there were other facts, although perhaps subject to innocent explanation, that a reasonable officer could have interpreted as establishing that Valencia was engaged in the illegal transportation of cocaine in cooperation with defendant Thomas. While it is a very close question, under the totality of the circumstances, Officer Washington possessed probable cause to arrest Valencia (and Minotta) for cocaine possession, even though absolutely no cocaine had been discovered in their vehicle.[31] *Cf. United States v. Recalde*, 761 F.2d 1448 (10th Cir.1985) (discovery of altered screws in interior of car does not make for probable cause to arrest driver).

■■■ Section 14.03(a)(1) of the Texas Code of Criminal Procedure allows for a warrantless arrest by a peace officer "when a person is found in a suspicious place and under circumstances which reasonably show that the person has been guilty of some felony or breach of the peace, or threatens or is about to commit some offense against the laws." The determination of whether a place is suspicious is highly fact specific. *King v. State*, 631 S.W.2d 486, 497 (Tex.Crim.App.), *cert. denied*, 459 U.S. 928, 103 S.Ct. 238, 74 L.Ed.2d 188 (1982); *Holland v. State*, 788 S.W.2d 112, 114 (Tex.Ct.App.—Dallas 1990, pet. ref'd). It has been said that

[F]ew, if any places are suspicious in and of themselves. Rather, additional facts available to an officer plus reasonable inferences from those facts in relation to a particular place may arouse justifiable suspicions. We also recognize that 14.03 should be applied to authorize warrantless arrests in only limited situations.

*Johnson v. State*, 722 S.W.2d 417, 421 (Tex. Crim.App.1987), *overruled on other grounds*, *McKenna v. State*, 780 S.W.2d 797, 800 (Tex.Crim.App.1989).

■■■ A person's own home can become a "suspicious place" under the proper circumstances. *See Douglas v. State*, 679 S.W.2d 790, 790–91 (Tex.Ct.App.—Fort Worth 1984, no pet.) (*inter alia*, dead body

---

**29.** These facts are based either on Washington's credible testimony or were uncontradicted at the hearing.

**30.** While it is a factor of only limited significance, U.S. 59 is a highway frequently used by drug couriers.

**31.** The circumstances as the officer knew them at the time of Valencia's arrest barely had crossed the line from mere suspicion to probable cause. It would have been a far better tactic to have employed the drug dog to sniff the second car to confirm or negate Washington's suspicions concerning its involvement in cocaine trafficking. A search of the passenger compartment of the second vehicle, which would not have required probable cause, would have been justified at the scene on account of Minotta's arrest for drug possession. *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

found in the front yard). A neighborhood sidewalk in broad daylight can also be a suspicious place. *See Thomas v. State*, 681 S.W.2d 672, 676 (Tex.Ct.App.—Houston [14th Dist.] 1984, pet. ref'd) (men carrying television in neighborhood that had experienced rash of burglaries). Finally, a person's car has been found to be a suspicious place. *Hamel v. State*, 582 S.W.2d 424, 426–27 (Tex.Crim.App. [Panel Op.] 1979) (based on defendant's behavior, informant tips, prior convictions and police investigation). Under the circumstances presented here, which were noted above, each of the automobiles had become "a suspicious place" under Texas law and the defendants' warrantless arrests under 14.03(a)(1) were proper.[32]

### E. The Search of the Vehicles at the Detention Center

After their arrests defendants were taken to Panola County detention center, and their vehicles were driven there as well. Washington testified that, in the course of another search of Thomas' vehicle at the detention center, the officers found themselves unable to remove the interior rear side panels of the car, which were adjacent to where the cocaine and currency had been discovered. Officer Macmillan had observed wires behind the seat of Thomas' car during Washington's search of it at the side of the highway. At the station, the officers traced these wires to a location under the dash, and found an electronic device. They completed the circuit and in doing so opened electronically controlled trap-doors through which the cocaine had been placed inside the interior side panels. After finding trap-doors in first car, the officers went to second car, and found wires there also. Identical secret compartments were located in the vehicle occupied by Valencia and Minotta. No cocaine was discovered stashed within those compartments.

■ In his written report, Officer Washington labelled the station house vehicle searches as searches incident to arrest. The government seeks to justify them as inventory searches. The searches cannot be upheld on either of these bases. The searches were, nonetheless, proper because they were based on probable cause, although in the case of the second vehicle, the existence of such probable cause was marginal.

■ In *New York v. Belton*, the Supreme Court established that when a police officer makes a lawful, custodial arrest of the *occupant* of an automobile, the officer may, as a *contemporaneous* incident of that arrest, search the passenger compartment of that automobile, including any containers therein, but may not extend the search to the trunk. 453 U.S. 454, 460, 461 n. 4, 101 S.Ct. 2860, 2864, 2864 n. 4, 69 L.Ed.2d 768 (1981) (emphasis added). No probable cause is required, and the arrestee does not need to be the driver.[33] At least two federal circuits have ruled that a search incident to an arrest in a vehicle must occur at the time and place of arrest, or else it does not qualify as a *Belton* search. *United States v. Butler*, 904 F.2d 1482 (10th Cir.1990); *United States v. Monclavo–Cruz*, 662 F.2d 1285 (9th Cir. 1981). Here, the vehicle searches occurred at a separate locale and after the passage of a significant amount of time. Therefore, the station house searches were not valid searches incident to arrest under *Belton*.

*United States v. Iredia*, 866 F.2d 114, 119 (5th Cir.) (per curiam), *cert. denied*, 492 U.S. 921, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989), supports this conclusion. There an officer arrested the defendant for credit card fraud and conducted a *Belton* search of the defendant's car. The officer observed the defendant's address book in plain view in the vehicle, and later testified

---

**32.** The arrests here cannot be justified under 14.04 (exigent circumstances) since there must be some evidence which shows that the person the police sought to arrest was "about to escape" for this exception to the warrant requirement to apply. *Green v. State*, 727 S.W.2d 263, 266

(Tex.Crim.App. [Panel Op.] 1987). There was no evidence here that any of the defendants were about to escape.

**33.** 3 Wayne R. LaFave, *Search and Seizure* § 7.1(c), at 13 n. 66 (2d ed. 1987 & Supp.1992).

that its evidentiary value was immediately apparent to him. 866 F.2d at 119. However, the officer did not remove the book from the car at the time of the *Belton* search but did so only after the car had been moved to the Secret Service garage. The *Iredia* court ruled that removal of the book at the station was nevertheless proper because the address book and its evidentiary value had been recognized during the *Belton* search, at the time and place of arrest.

Here, Officer Macmillan testified that at the arrest scene the wires for the secret side panel compartments were not observed in the second automobile. Officer Washington recollected that at the scene he believed the wires in Thomas' vehicle were for the car's speakers. Both officers discovered the significance of the wires and the contraband concealment system only at the station house. Therefore, the searches conducted at the station do not fall within the authority of *Belton*. Moreover, exigent circumstances, which might in some extraordinary situations justify delaying a *Belton* search to protect officer safety, were not present here. *Cf. United States v. Pollack*, 895 F.2d 686, 693 (10th Cir.), cert. denied, — U.S. —, 111 S.Ct. 520, 112 L.Ed.2d 532 (1990).

A valid inventory of an impounded automobile is an exception to the requirement that the police may conduct searches only in accordance with a valid warrant. *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 367–68, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976); *United States v. Skillern*, 947 F.2d 1268, 1275 (5th Cir.1991). If an inventory is part of a bona fide "routine administrative caretaking function" of the police, and not a pretext to disguise an impermissible search for evidence, probable cause is not required. *Skillern*, 947 F.2d at 1275 (citations omitted). The Fourth Amendment only requires that such a good faith inventory be consistent with reasonable, standardized police procedures. *Id.*

Officer Washington testified that Texas Department of Public Safety has an inventory policy, although he has never seen a written copy of it. There is no deficiency in the failure of the government to produce written regulations governing car inventories. The Fifth Circuit has explicitly held that the prosecution need not produce such regulations, and that oral testimony of compliance with the applicable regulations is sufficient. *Skillern*, 947 F.2d at 1275. However, at the hearing on defendants' motions to suppress, Officer Washington admitted that the search of the Valencia's vehicle was for the purpose of locating contraband and not for inventory purposes. Likewise, it is clear that the exploration of the trap door mechanism in Thomas' car was for evidentiary rather than inventory purposes. It is concluded that the station house searches of both vehicles were not valid inventory searches.

Last term, the United States Supreme Court reaffirmed that an officer who has probable cause to search a vehicle may do so without a warrant, and for the first time the Court held that no warrant was required for the search of any loosely closed containers within the vehicle. *California v. Acevedo*, — U.S. —, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). *See also, United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *United States v. Armendariz–Mata*, 949 F.2d 151, 154 (5th Cir.1991). Such a search need not occur contemporaneously with an arrest. *United States v. Johns*, 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) (three days delay is still acceptable).

For the same reasons explicated in section II.D., *supra*, which furnished the probable cause for defendant Valencia's arrest for cocaine possession, the detention center search of the car which had been occupied by Valencia and Minotta for contraband was supported by probable cause, if only just barely. There can be little doubt, however, the further search of Thomas' vehicle at the detention center was based on probable cause. The earlier discovery of a large amount of stashed cocaine and currency in the side panels provided the officers with ample justification for searching Thomas' vehicle thoroughly at the station-house. Therefore, all the evidence seized from

both vehicles by means of the searches conducted at the detention center is admissible at trial against the defendants.

### III. *Conclusion*

It remains a cardinal principle that searches conducted outside the judicial process, without the prior approval by a judge or a magistrate, are *per se* unreasonable—subject only to a few specifically established and well delineated exceptions. *Acevedo,* 111 S.Ct. at 1991. For the foregoing reasons, and with the one noted exception, it is concluded that the evidence discovered by the warrantless searches and seizures conducted August 4, 1991, were obtained through activities that come under the growing rubric of warrantless but constitutionally reasonable law enforcement practices.